# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 94-KA-00946-SCT

*KAY TERRY, a/k/a KAY L. TERRY, a/k/a KAY LYNN
TERRY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/94 |
| TRIAL JUDGE: | HON. EUGENE M. BOGEN |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WILLARD L. McILWAIN, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  JOLENE M. LOWRY |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 8/6/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/27/98 |

**EN BANC.**

**ROBERTS, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. Kay Terry was employed as a cashier at Friedman Iron & Steel in Greenville. She worked there from February 11, 1991, until June 1993. She was accused of embezzling large sums of money from her employer. Terry was tried first on January 4, 1994, resulting in a mistrial. She was tried the second time on September 7, 1994, and was convicted of embezzlement.

¶2. Prior to the trial, Terry filed a motion for the Court to recuse itself. The trial judge, the Honorable Eugene M. Bogen of the Washington County Circuit Court (hereinafter "Judge Bogen"), overruled the first motion without a hearing, but later granted a hearing on the motion after Terry's attorney complained that he had requested a hearing. The motion was based on the involvement of the Special Prosecutor and his law partner in Judge Bogen's election campaign, as well as an alleged connection between Judge Bogen and Terry's employer. Judge Bogen overruled the Motion for Recusal. At trial, the court excluded testimonial evidence that someone other than Terry had taken the money. After disallowing any evidence of another being guilty of embezzlement, Judge Bogen denied Terry's jury

instruction (D-5) that allowed a "not guilty" verdict if the jury found another to have taken the money. Judge Bogen based his denial on failure of the evidence to show that someone else took the money.

¶3. The jury found Terry guilty of the charge of embezzlement. Judge Bogen sentenced her to 10 years and ordered her to pay $100,000 in restitution and all costs, including the expenses for the removal of the case to Adams County. It is from this sentence that Terry has appealed raising the following assignments of error:

**I. WHETHER THE TRIAL COURT ERRED IN FAILING TO RECUSE ITSELF FROM THIS CASE.**

**II. WHETHER THE TRIAL COURT ERRED IN FAILING TO ALLOW TERRY TO PUT ON TESTIMONY AND OTHER EVIDENCE AS TO ALTERNATE THEORIES OF HER DEFENSE.**

**III. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW TERRY TO IMPEACH A STATE'S WITNESS WITH AN ALTERED DOCUMENT.**

**IV. WHETHER THE TRIAL COURT ERRED IN REFUSING INSTRUCTION D-5.**

## STATEMENT OF FACTS

¶4. Kay Terry was a cashier at Friedman Iron & Steel. She had been employed there from February 11, 1991, until June 1993. Terry was accused of embezzling large sums of money. Her first trial ended in a hung jury on January 4, 1994. Terry was convicted at her second trial of the embezzling charge and sentenced to 10 years in prison and ordered to pay restitution of $100,000.

¶5. Prior to the trial, Terry filed a motion for Judge Bogen to recuse himself. This motion was at first overruled without a hearing, although one had been requested. Later after Terry complained, a hearing was granted with the same disposition as before. Terry based her motion on evidence that the Judge Bogen had exhibited bias and prejudice toward her and her attorney.

¶6. The following examples were offered to Judge Bogen as evidence of this bias and prejudice:

1. Terry had originally been released on her own recognizance, but the judge revoked her bond and imposed a $25,000 bond. Terry had no criminal record and other area defendants' bonds were lower.

2. The relationships between the Special Prosecutor, Gaines Dyer; his brother (law partner), Howard Dyer, III; Terry's employer, Friedman; and Judge Bogen; were called into question.

3. Evidence that the Dyer law firm was one of the largest contributors to the Bogen campaign when he ran for circuit judge.

4. Howard Dyer, III, served as one of Judge Bogen's campaign managers.

5. Evidence existed that Gaines Dyer's clients got favorable treatment when appearing in front of Judge Bogen.

6. Judge Bogen had approached Terry's attorney requesting that he be allowed to add his name to a list of supporters in an ad in the newspaper. When the attorney refused, he felt he was treated "coolly." The attorney felt that pressure was being placed upon him to allow his name to be used as part of a political campaign.

7. Prior to Terry's second trial, Judge Bogen brought contempt proceedings against Terry, her attorney, and a third party. These constructive contempt proceedings were also handled by Judge Bogen, and he sentenced Terry, her attorney, and the third party, to all serve time in jail.

8. Although in the first trial he allowed the proof, Judge Bogen refused to allow Terry to offer proof in the second trial that Friedman had taken the money instead of her.

¶7. A Motion in Limine was filed by the State to exclude any comment or proof regarding, among other things:

1. That Friedman maintained an employee theft insurance policy on which they collected $100,000 as a result of the allegations against Terry.

2. The allegation by Terry that the company was in bad shape, financially.

3. That Friedman possessed large sums of cash.

4. That Friedman had taken funds which Terry was accused of taking.

¶8. The insurance claim was paid as a result of the investigation of tickets and documents assimilated by Friedman's wife, a CPA, for the purpose of obtaining insurance benefits. The State's CPA, who was a key witness, examined the records compiled by Friedman's wife. In the second trial the court did not allow any testimony concerning the issue of employee theft insurance or that the records the State's CPA based his testimony on were compiled by Friedman's wife to make an insurance claim.

¶9. Judge Bogen did not allow any testimony suggesting that Friedman took the money from the cash drawer instead of Terry. No mention was permitted regarding the theft insurance policy, nor the financial situation of the company. The only proof allowed regarding these topics was a written proffer. The trial court did allow testimony that other employees were responsible for the alleged losses, but proof of Friedman's responsibility for the losses was excluded.

¶10. Terry was a weigher and cashier at the company. The customer would bring in scrap metal materials, and Terry and another cashier, who shared responsibilities, would weigh the metal and pay the customer. A ticket would be filled out showing the weight, date and the amount paid to the person. A computer sheet was also generated which had a number corresponding to that of the ticket. Contrary to the State's original theory, almost half of the tickets with an error were in the handwriting of the other cashier.

¶11. One of the State's witnesses was a CPA named Bobby Dalton, who was hired by the insurance company to examine the records furnished to him by Mr. Friedman's wife. These records were used to determine whether or not Kay Terry had misappropriated money, and whether the insurance company would pay Friedman's $100,000 claim under the employee theft policy. Terry renewed her request to introduce evidence concerning the source of the information on which Mr. Dalton relied.

Judge Bogen ruled that he would not allow impeachment of Mr. Dalton's testimony. Terry sought to cast doubt on Dalton's investigation since it was primarily based on information which emanated from Friedman's wife who had a pecuniary interest in collecting on the insurance claim.

¶12. The defense contended that the prosecution opened the door by placing Dalton on the stand and asking him questions related to his examination on behalf of the insurance company. Dalton acknowledged that some of the transactions that showed discrepancies were dated prior to the time Terry started work at Friedman's. Dalton also acknowledged that all of the information furnished to him was provided by the people at Friedman's. Dalton admitted that he originally had written a letter saying that all of the tickets in question were in Terry's handwriting. Later proof revealed that these tickets were in the handwriting of the other cashier and that no tickets were falsified by Terry. Further, Dalton stated there was no way to prove who entered the different figure from a ticket into the computer printout.

¶13. Tim Bixler, an executive with Friedman Iron & Steel, testified concerning the transaction journal (computer printout). He testified that it could not be altered. In an attempt to impeach Bixler's testimony that the journal could not be altered, counsel for Terry handed him a phony transaction journal and a ticket. Bixler was asked to distinguish between the real transaction journal and the false one. Judge Bogen asked the defense counsel what he wanted the witness to do. The attorney responded, "I want him to acknowledge that he identified a document as being a transaction journal and just then called this the real one and did not know the difference." Judge Bogen then admonished Terry's counsel and refused to allow Bixler to be impeached by the use of an altered document.

¶14. Harvey Tackett, Jr., CPA, testified regarding the tickets, ledgers, cash drawer, safe, etc. Tackett said that the person who took the money, would have needed access to the computer system, the cash drawer, the safe and "without question be able to get into the building after hours when no one else was there . . . ." Terry testified that she did not have the code to the security system, but that Bixler, Friedman, and Hammers, did have it. Terry also denied having taken any money from the company. Terry testified that during the nine (9) months prior to working at Friedman's, she had been unemployed and had substantial income. Her deposits ranged from approximately $3,000 to $6,000 per month.

¶15. Terry testified that her handwriting and that of the other cashier were different. Terry agreed with the handwriting expert that almost half of the tickets with discrepancies on them were in Hammers' handwriting and not Terry's. One of the tickets on which a discrepancy had been alleged was written two days before she ever started work at Friedman's. Another on May 14, 1993, was on a day she was not even at work, and one was dated after she no longer worked at Friedman's.

¶16. There was testimony that Terry had paid cash for some items, such as a down payment on a vehicle. Terry stated one of the reasons she kept cash out of her bank account after leaving Friedman's was because the Internal Revenue Service was attempting to levy against her personally. Although levied against her personally, the I.R.S. liens came as a result of a business that she had prior to working at Friedman's. Terry offered copies of the liens, and the court refused to allow them into evidence. The court ruled that the only proof that would be allowed has to concern liens against her individually arising from her earned income, not personal liability that she had as a result of her business.

¶17. Instruction D-5 submitted by Terry stated, "The Court instructs the jury that if you believe that someone other than Kay Terry embezzled or took money for which Kay Terry is charged with taking, then in that event your verdict shall be 'We, the Jury, find the Defendant, Kay Terry, not guilty'." The court refused to grant Instruction D-5, stating, "There is no evidence that anybody else took any money." The court refused to allow Instruction D-5 which was Terry's theory of the case.

¶18. The jury deliberated from 5:25 p.m. to 10:00 p.m. and was unable to reach a verdict. Several of the jurors stated that they did not know if further deliberations would be productive. The court instructed the jury to go home, over the objection of counsel for Terry, and the court adjourned at 10:10 p.m. The jury reconvened the next morning, September 9, 1994, and after approximately two more hours of deliberations, reached a verdict of "guilty."

¶19. Judge Bogen imposed the maximum sentence on Kay Terry, which was 10 years to serve and ordered her to pay $100,000 in restitution and all costs, including the expenses for the removal of the case to Adams County of approximately $4,000. The court ordered a $50,000 appeal bond on Terry. It is from this conviction and sentence that Terry has appealed to this Court.

## DISCUSSION OF THE ISSUES

### I. WHETHER THE TRIAL COURT ERRED IN FAILING TO RECUSE ITSELF FROM THIS CASE.

¶20. The trial judge in this case, Circuit Judge Eugene M. Bogen, is no longer a circuit judge. He voluntarily left the state bench to take a position as a United States Magistrate Judge. Because this case is to be reversed and remanded for a new trial on other issues, this Court holds that this issue is moot. On remand, this case will be heard by a different trial judge and we will not address the merits of this issue.

### II. WHETHER THE TRIAL COURT ERRED IN FAILING TO ALLOW TERRY TO PUT ON TESTIMONY AND OTHER EVIDENCE AS ALTERNATE THEORIES OF HER DEFENSE.

¶21. The State filed a motion in limine asking the court for an order excluding:

1. Any proof by Terry as to any insurance policy and/or the filing of a claim and the collection of the same as it related to the case.

2. Any proof by Terry of any alleged misappropriation of corporate funds by Friedman separate and distinct from the funds allegedly embezzled by Terry.

A hearing was held on this motion and the State announced that the motion was filed to avoid particular statements made by defense counsel at the first trial of this cause which ended in a mistrial. Terry was attempting to use as her defense that Friedman took money from the company. The State argues that instead of trying to prove that she did not steal the money, she was attempting to show that someone else could have taken the money.

¶22. Barry Friedman, president of the business, maintained an employee theft insurance policy on

which he made a claim and collected $100,000 based on the allegations that Terry embezzled money from the company. Terry proffered evidence, which was refused by the lower court, that Friedman had been seen taking money from the cash drawer from which Terry was accused of embezzling money. This was alleged to have taken place outside the normal course of business during the same period of time she was accused of embezzling money from the company.

¶23. At the first trial, Terry's attorney was able to make several statements to the effect that Friedman Steel was in financial trouble, and that Friedman had recently lost $100,000 in the bankruptcy of "Security Boat Works." The State claims that this was meant to lead the jury to infer that Friedman had a motive to steal from his own business. Mr. Dyer stated at the motions hearing that these statements were intended for no other purpose than to detract from the real issue in the case, whether Terry embezzled the money, and to attempt a character assassination of Friedman.

¶24. The State argues that in the first trial, defense counsel was able to make statements concerning Friedman's collection of an insurance policy, which insured Friedman Steel up to $100,000 against employee theft. Further, the State claims that Terry's attorney was attempting to use this information to show that Friedman fabricated the whole case against Terry because his company was in financial trouble, and he needed the money.

¶25. Terry states that the court erred by not allowing evidence that the company was in dire straits financially or that Friedman kept large sums of cash in his desk and in a safe within the walk-in safe at his office. The court also excluded evidence of an affidavit Terry gave to the police after her arrest telling them where large sums of cash were kept at the business and requesting the police to issue a search warrant for Friedman's office to show that he did have the large stores of cash. The court ruled that if Friedman had taken large sums of money, it was not relevant to the case *sub judice*, but rather it may have been unreported income and a matter for the I.R.S. to investigate.

¶26. The trial court granted the motion in limine and stated as follows:

> THE COURT:
>
> The last time against my better judgment I let a lot of this proof in, and I've come to the conclusion I was in error in doing so. I'm going to grant the State's motion to exclude all of this with one possible exception.
>
> To begin with, it is not relevant whatsoever that the defendant corporation--I mean, that the victim corporation had insurance coverage. Not relevant whatsoever, nor is its financial condition.
>
> The claim that Barry Friedman occasionally took money from the cash drawer, again, is not relevant or probative on the issue of whether Kay Terry embezzled funds from the corporation. Even if I assume for the sake of argument that Barry Friedman took cash money from the drawer and failed somehow to account for it in the corporation's books, that's no defense to Kay Terry having embezzled money from the corporation.
>
> I'm going to order counsel and the defendant herself, you are to make no statement whatsoever about any insurance policy. There is to be no statement or proof offered regarding the financial

condition of the corporation. There is to be no statement or proof offered as to Barry Friedman taking money out of the cash drawer or any statement or proof offered regarding some claim of the misappropriation of corporate funds by Barry Friedman.

Now the last time this case was tried, out of my concern that the defendant get a fair trial and believing representations regarding the development of proof that there may have been other persons responsible for the loss, I allowed a lot of this evidence to come in. What it turned out to be was basically accusations made by counsel unsupported by any proof whatsoever, and what I let you do was essentially the same thing that used to be done to rape victims before the laws were changed to prevent defendants from trashing the character of the victim as if that were a defense to rape. The similarities between that type of case and this one are striking. Barry Friedman is not on trial and his character and reputation are not going to be trashed, nor is the financial condition of the corporation.

\*\*\*

As to her claims about the override of the computer: To the extent that she claims other employees had access to the computer, to the computer system, then she may be permitted to offer proof that someone other than herself made entries into the computer system. That's a defense that she didn't do it, but all this other stuff is not a defense. That's just an attempt to throw several skunks into the jury box and hope to stink up the situation badly enough that the jury might overlook the facts of the case, and that's not going to happen the second time around.

¶27. Judge Bogen did allow defense counsel the opportunity to prepare a written proffer containing a summary of the evidence that he would have offered. Defense counsel submitted his proffer for the record and stated that all of the allegations claimed therein would be substantiated by Al Kossman, Dee Motague and Kay Terry; however, no affidavits from any of the "potential witnesses" were included as a part of the proffer. The proffer was solely assertions of Terry and her counsel.

¶28. In **Kennedy v. State**, 278 So. 2d 404, 406 (Miss. 1973), this Court held when an accused is being tried for a serious offense, the jury is entitled to hear any testimony that the appellant might have in the way of an alibi or defense. This Court ruled in **Love v. State**, 441 So. 2d 1353, 1356 (Miss. 1983), that litigants in all cases, including defendants in criminal prosecutions, are entitled to assert alternative theories, even inconsistent alternative theories. A criminal defendant is entitled to present his defense to the finder of fact, and it is fundamentally unfair to deny the jury the opportunity to consider the defendant's defense where there is testimony to support the theory. **Keys v. State**, 635 So. 2d 845, 848-49 (Miss. 1994).

¶29. Terry asserts that it was fundamentally unfair for the court to exclude evidence that another person took the money which she was accused of embezzling, particularly when this was a circumstantial evidence case. Terry cites to the following facts which point to Friedman as having been the person who took the money:

1. eye witness testimony that he took money from the cash drawer not in the regular course of business;

2. he directed employees to alter tickets;

3. his company was having financial problems;

4. he maintained an employee theft insurance policy on which he collected $100,000;

5. he had his wife, instead of his normal CPA, supply the records to the CPA who represented the insurance company, who is also the same CPA who testified against Terry at trial; and

6. Terry knew where Friedman kept large sums of cash and asked the Police Department to investigate that matter, which they refused to do.

¶30. Terry claims that it was fundamentally unfair for the court to exclude this evidence when viewed under this Court's holding in *Keys*. Terry concedes that relevancy and admissibility are largely within the discretion of the trial court, but contends this was an abuse of discretion that merits reversal. *Lambert v. State*, 462 So. 2d 308, 313 (Miss. 1984). Terry cites this Court to its earlier holding in *Barrett v. State*, 253 So. 2d 806, 810 (Miss. 1971), which was a case involving embezzlement with accusations made based on circumstantial evidence. In that case the Court quoted from the previous case of *Thompson v. State*, 83 Miss. 287, 289, 35 So. 689, 690 (1904), the words of Judge Truly:

It has always been, is now, and we trust ever shall be, the law in criminal cases that, where there are two reasonable hypotheses arising out of and supported by the evidence, it is the duty of the jury to adopt the hypothesis consistent with innocence, even though the hypothesis of guilt be the more probable.

*Barrett*, 253 So. 2d at 810.

¶31. Terry claims she was denied the opportunity for the jury to adopt her hypothesis because the jury never heard her hypothesis.

¶32. This Court adopted a modern doctrine regarding the admissibility of evidence in *Minor v. State*, 379 So. 2d 495 (Miss. 1979), with the following:

"The modern doctrine is extremely liberal in the admission of any circumstances which may throw light upon the matter being investigated, and great latitude must be given the prosecution in the production of its evidence in proof of criminal charges. . .[W]here the proper determination of a fact depends upon circumstantial evidence, the safe practical rule to follow is that in no cases is evidence to be excluded of facts or circumstances connected with the principal transaction from which an inference can be reasonably drawn as to the truth of a disputed fact."

*Id.* at 497 (*quoting* 29 Am. Jur. 2d *Evidence* § 266, at 315 (1967)). Terry states that the above is what she was faced with, and she was denied her right to present her defense.

¶33. This Court agrees with Terry, with one qualification. All evidence that is proposed by either side to be used to further its theory, hypothesis, or argument, must first comply with the Mississippi Rules of Evidence promulgated by this Court to be effective as of January 1, 1986, along with any subsequent amendments. As stated earlier, the relevancy and admissibility of evidence are largely

within the discretion of the trial judge and reversal is proper only where that discretion has been abused. *Johnston v. State*, 618 So. 2d 90, 93 (Miss. 1993). "The discretion of the trial judge, however, must be exercised within the boundaries of the Mississippi Rules of Evidence." *Id.*; *See* Miss. R. Evid. 103(a), 104(a).

¶34. First, the State argues that the evidence proffered was irrelevant and would only confuse the jury if admitted. The State draws this Court's attention to Miss. R. Evid. 401 that defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R. Evid. 401. The longstanding rule that Miss. R. Evid. 403 is the filter through which all evidence flows needs no citation. Miss. R. Evid. 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Id.*

¶35. Secondly, the State argues that the proffer by Terry was supported only by her allegations. The written proffer did not contain any affidavits from the witnesses who were alleged to offer testimony that would have substantiated the proffer. The State directs the Court's attention to *Gerrard v. State*, 619 So. 2d 212, 219 (Miss. 1993), where it held:

> "[This Court] has on many occasions held that [it] must decide each case by the facts shown in the record, not assertions in the brief, however sincere counsel may be in those assertions. Facts asserted to exist must and ought to be definitely proved and placed before [the Court] by a record, certified by law otherwise, [the Court] cannot know them . . . ." This Court does not act upon innuendo and unsupported representations of fact by defense counsel.

The written proffer enumerates what Terry would have testified to if allowed to go into the details of what she says she witnessed, which was Friedman's involvement in the embezzlement for which she was accused.

¶36. Because he allowed the inferences to Friedman being responsible for the embezzled money in the first trial, it would seem that Judge Bogen should have allowed the same testimony and evidence as before. This Court finds that the defendant was entitled to present her theory of the case and have the jury determine whether someone else could have taken the money. Any fears of confusion the trial judge may have harbored could have been resolved by giving limiting instructions to the jury. By trying to avoid a second mistrial, he erroneously excluded any evidence of Friedman embezzling the money.

¶37. Terry should have been allowed to present evidence that would prove her theories of innocence. Because she was denied this opportunity, we reverse and remand for a new trial. On remand, the trial judge should afford Terry the opportunity to prove her theories of innocence. However, no evidence should be admitted without first traveling through the filter of Miss. R. Evid. 403.

### III. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW TERRY

**TO IMPEACH A STATE'S WITNESS WITH AN ALTERED DOCUMENT.**

¶38. The State's theory of the case against Terry was that during the time that she worked at Friedman, she wrote numerous tickets reflecting scrap metal received and corresponding payments of corporate funds to Friedman customers for such scrap. Numerous computer entries further documenting these transactions and made contemporaneously, or later on during the same day, invariably reflected pay-outs of corporate funds greatly exceeding the funds actually paid to the customers. There was proof that Terry had direct access to the corporation's computer to make the erroneous computer entries. However, Terry was not the only one who had access to the computers. Friedman, Hammers, Tim Bixler, and others had computer terminals that were on a network system.

¶39. Tim Bixler testified concerning the way business was conducted at Friedman. Bixler testified that most of the time Terry operated the pay window. Once the metal was weighed, a ticket was extended to the customer showing how much he would be paid. The customer was asked to sign the ticket to acknowledge that he had completed the ticket correctly, that he was getting the amount of money, and that the weights were right. The customer signed the ticket and was given a copy along with his money. The ticket number was then entered onto the computer with the payment made, producing a computerized "transaction journal."

¶40. Bixler explained that there was no significance to any of the testimony indicating who wrote the tickets, because that is not where the problem occurred. The problem occurred when whomever entered that ticket number into the computer also entered a higher amount attributed to it. It was typical for tickets to accumulate up with anybody's handwriting on them. The problem occurred when the information from the tickets was entered into the computer. Terry, Hammer, and Bixler were in and out of the safe, as it was open and available to both cashiers when they needed to procure more money.

¶41. During cross-examination, defense counsel began to question Bixler about what procedure would be followed if it were discovered that a legitimate mistake had been made in the transaction journal. Bixler explained that there is no way to go back and make a change because the record is permanently written:

> BY BIXLER:
>
> The transaction journal is printed. There's no way to go back. As far as the computer is concerned, the record is permanently written to memory. You can't alter it. You can only go back and refer to that transaction and make another one to fix it.

¶42. Terry's attorney began to pursue a new line of questioning from which her third assignment of error comes. He handed Bixler a ticket and a document, which he called a transactional journal. He asked Bixler to compare the amount on the ticket and the corresponding amount in the transactional journal. The two numbers were not the same, and Bixler stated that there appeared to be an error for which he was sure there were a number of legitimate explanations. Terry's attorney then explained that the document was not a real transactional journal, but a computer-generated counterfeit. The court sustained the State's objection to the question as being argumentative.

¶43. Later in the same line of questioning, the court asked McIlwain what it was that he wanted

Bixler to do. McIlwain responded that he "wanted Bixler to acknowledge that he identified a document as being a transaction journal and just then called this the real one and didn't know the difference." McIlwain when attempting to have the document admitted into evidence stated it was made up by his secretary, and the State objected. The following exchange took place when counsel approached the bench, but on the record:

MR. McILWAIN:

It's a fake. He's acknowledged this.

MR. PINTARD:

Your Honor, the whole crux of this thing is that they said that this computer could not be--I mean, everything's perfect. And we're going to show its not perfect. That's the way we're going to do it.

THE COURT:

I see, by having your secretary make up fake documents.

MR. McILWAIN:

Try tricking the witness, and he identified it as a transactional journal.

THE COURT:

Willard--

MR. DYER:

Your Honor, this is a counterfeit document.

THE COURT:

Exactly--

MR. McILWAIN:

That's right, exactly.

THE COURT:

--and it will be excluded. Now, this is not television which would be the only place that I know of where a stunt like this would be pulled.

MR. McILWAIN:

What is wrong with having him identify something that's clearly--he acknowledges is a--couldn't be done?

THE COURT:

I don't have time to instruct you on that, but I'm going to tell you this, there better not be any more counterfeit exhibits shown to a witness or produced in this courtroom during this trial. Do I make myself clear?

¶44. Terry claims that she should have been allowed to cross-examine Bixler with this forged document as it would have constituted "impeachment." Terry states that Bixler acknowledged the fake transaction journal was authentic and that would have served as impeachment of his statement that the transaction journal cannot be altered. The State responds to this by saying the record is void of any statement by Bixler that the fake transaction journal was an authentic transaction journal.

¶45. However, Terry contends that the court's preventing her from impeaching Bixler with the document denied the right to confrontation of the State's witness guaranteed in the State Constitution and the United States Constitution. *Hubbard v. State*, 437 So. 2d 430, 433-34 (Miss. 1983). "The constitutional right of confrontation of witnesses encompasses the right to cross-examine them." *Id.* at 434. Terry states that this right was denied when the trial court refused to allow the witness to be questioned about a document which he stated could not be altered. Bixler stated that the original transaction journal could not be altered. Terry was attempting to introduce a counterfeit document, to prove that an altered document could have been substituted for the real one.

¶46. The State contends that impeachment with this forged document would have been irrelevant to her defense because it would not tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R. Evid. 401. The scope of cross-examination "shall not be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." Miss. R. Evid. 611(b).

¶47. The Court holds that Terry was denied her right to cross-examine Bixler. She was limited to examining him with relevant questions on relevant matters. McIlwain's attempt to impeach Bixler with the "fake" produced by his own secretary was proper because defense counsel was refuting Bixler's assertion that the transactional record could not be altered. This Court finds that it was an abuse of discretion on the part of the trial judge to prevent impeachment of Bixler with the "fake" transaction journal.

## IV. WHETHER THE TRIAL COURT ERRED IN REFUSING INSTRUCTION D-5.

¶48. Because the trial judge granted the State's motion in limine, he likewise refused Defense Instruction D-5 which stated:

> The Court instructs the jury that if you believe that someone other than Kay Terry embezzled or took money for which Kay Terry is charged with taking, then in that event your verdict shall be, "We, the Jury, find the Defendant, Kay Terry, not guilty."

The State argues that the motion in limine was properly granted, and this instruction was correctly refused because it was not supported by the evidence adduced at trial. "'Our law is well settled that jury instructions are not given unless there is an evidentiary basis in the record for such.'" *Dedeaux v. State*, 630 So. 2d 30, 33 (Miss. 1993) (*quoting Davis v. Davis*, 530 So. 2d 694, 701 (Miss. 1988)). The State concedes that a defendant is entitled to have an instruction on his theory of the case. However, "a trial judge may refuse an instruction which incorrectly states the law, is without

foundation in the evidence, or is stated elsewhere in the instructions. *Murphy v. State*, 566 So. 2d 1201, 1206 (Miss. 1990).

¶49. Terry contends that the trial judge was in error for refusing to allow the jury to hear her theory that Friedman took the money. Therefore, had she been able to put on proof that he was the one who took the money, she would have been entitled to her jury instruction D-5. Terry alluded several times that the case built against her was done purely with circumstantial evidence. If this is true, where all the evidence tending to prove the guilt of the defendant is circumstantial, the trial judge must grant a jury instruction that every reasonable hypothesis other than that of guilt must be excluded in order to convict. *Givens v. State*, 618 So. 2d 1313, 1318 (Miss. 1993); (*citing* *Henderson v. State*, 453 So. 2d 708, 710 (Miss. 1984).

¶50. Because we have already determined that the trial judge erroneously excluded the evidence indicating Friedman was the one who took the money, and not Terry, the D-5 instruction should be granted. The evidence should be allowed on retrial as long as it meets the requirements of the Mississippi Rules of Evidence. If the evidence is presented, then sufficient support will exist for the instruction, thereby allowing the defendant to advance the theory of her case.

## CONCLUSION

¶51. The issue regarding the recusal of Circuit Judge Eugene M. Bogen, due to an impropriety or the appearance of an impropriety, is moot, as Judge Bogen is now a United States Magistrate Judge. The trial judge should have allowed the defendant to present evidence as to her theory of the case. On remand if the evidence is presented, D-5 should be allowed, as it will be supported by the evidence and warranted in order to properly instruct the jury as to the theory of the defendant's case. Lastly, the impeachment of Bixler with a "fake" document was improperly denied by the trial judge, as it was relevant, impeachment evidence by the defense attorney.

¶52. **REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, McRAE, SMITH, MILLS AND WALLER, JJ., CONCUR.**