237 So.2d 844 (1970)
Billy F. MOORE, Jr.
v.
STATE of Mississippi.
No. 45875.
Supreme Court of Mississippi.
July 2, 1970.
*845 James G. McIntyre, Jackson, for appellant.
A.F. Summer, Atty. Gen., by Velia Ann Mayer, Sp. Asst. Atty. Gen., Jackson, for appellee.
GILLESPIE, Presiding Justice.
Upon conviction in the Circuit Court of Tunica County for the March 1, 1969, murder of Mrs. Zylene O. Mitchell, this appeal is prosecuted by Billy F. Moore, Jr. (hereinafter defendant). We affirm.
The following chronology summarizes the testimony bearing upon the events surrounding the death of Mrs. Mitchell and the arrest of defendant. A statement of the facts relative to the issue of insanity is included in the latter portion of this opinion. During the afternoon of February 28, 1969, defendant joined several male acquaintances for a drink as they proceeded to a nearby hunting lodge in order to light the heaters therein. That evening, defendant and his wife attended a birthday supper party being given in honor of a friend at the home of the Vance Moores. Having arrived with a drink in his hand, defendant was observed by those at the party to have imbibed two or three drinks before leaving shortly after midnight.
About 2:45 in the morning of March 1, 1969, Henry Lee received a telephone call from Mrs. Mitchell whom he had known approximately twelve years. Thereupon Lee left his home and went to his office at the Gulf Bulk Distribution Plant (hereinafter Bulk Plant) where he remained for nearly thirty minutes during which time two telephone calls were made: one to Mrs. Mitchell with whom he had a brief conversation and the other to Mrs. Gloria Bennett who was asked to check on Mrs. Mitchell. When Mrs. Bennett called about three o'clock, Mrs. Mitchell asserted that she was "all right" and then the telephone was abruptly hung up. After departing from the Bulk Plant between 3:30 a.m. and 3:45 a.m., Lee was driving north along Highway 61 when signaled to stop by defendant who was driving a southbound vehicle in which Mrs. Mitchell was seated. As defendant, with whom he had previously altercated concerning a plot of land, cursed him and began to get out of his vehicle, Lee drove away. Looking back, Lee observed the rear wheels of defendant's vehicle become stuck in a ditch while the car was being turned around to facilitate pursuit by defendant. Bedford Love, the night marshal of Tunica, noticed defendant and an unidentified person along Highway 61 just south of town as they sat in a vehicle, the rear wheels of which were stuck in a ditch. Defendant consented to Love's offer to summon assistance. John R. Smith, Jr., an attendant at a nearby service station, saw an unknown black-headed woman wearing a red housecoat in the car of defendant which required the use of a wrecker in order for him to extricate it from the ditch.
Shortly after 8:00 a.m., defendant appeared at the Bulk Plant and informed J.Z. McCain of his desire to see Henry Lee whose sister Margaret Harrell thereupon told defendant that Lee was talking on the telephone. Mrs. Harrell walked into Lee's office, shut the door and fastened the night latch. When Lee had terminated the telephone conversation, he directed his sister to notify the sheriff and then he departed through the rear door. Leaving the building, Lee overheard defendant order *846 McCain to admit him into Lee's office since "I've killed that woman and I want to get in there to kill Henry." McCain refused, and defendant fired thirteen pistol shots into Lee's office door. Soon thereafter Tunica County Sheriff Joe Carsley arrived in response to a request to investigate a possible law violation at the Bulk Plant. Upon parking about fifteen to twenty yards from the main office, Carsley and Highway Patrolmen A.D. Gatewood and H.B. Grisham advanced to a point within twelve feet of the office when defendant emerged from the door with a carbine and told them not to come any closer and to take their hands from their pockets. Defendant, having worked with the three men, recognized them as law enforcement officials even though they were attired in street clothes and without any weapons open to view. When Sheriff Carsley inquired as to what the trouble was, defendant replied, "Joe, I've messed up." Once inside the Bulk Plant office, the sheriff found the bullet-riddled door locked, and he received no response to his call for Lee. During this time defendant had returned to his car and as Sheriff Carsley neared, defendant declared, "I've killed that son of a bitch that belonged to Henry Lee." Knowing the reference was to Mrs. Mitchell, the sheriff said, "Billy, you're bound to be joking." Defendant replied, "Come on, I'll show you." Having agreed to allow Patrolman Gatewood to drive his car while Sheriff Carsley sat on the back seat, defendant, a M-2 rifle across his knee and a .357 magnum in his hand, gave directions to Gatewood. Patrolman Grisham followed in the patrol car so as to maintain radio communications.
During the seven or eight mile ride, defendant requested, "Don't push me. I've got two more stops to make, and then I will give myself up." The two officers refused defendant's offer of a drink but defendant himself took two or three drinks of straight whisky. Defendant explained, "I've got the truth out of [Mrs. Mitchell]. She told me the truth. She did write the letters to [Highway Patrol Headquarters requesting my transfer from the Tunica area], and made the telephone call under * * * threats from Henry Lee." Defendant next stated that he forced Mrs. Mitchell out of his car at the Lula Hunting Club, located near where he and his companions had driven on the previous afternoon, and shot her with the M-2 rifle. Also during the drive to the death scene, defendant handed two hand guns to Sheriff Carsley and stated that one belonged to Mrs. Mitchell from whom he had taken it; he refused to relinquish the .357 magnum.
Defendant was the first person to spot the body to which, after the vehicle was brought to a stop, all of them walked. Mrs. Mitchell, clothed in a red housecoat and lying on the ground of the levee, was dead with a bullet wound in the head. Defendant then unloaded the .357 magnum which he had been holding and surrendered it to Sheriff Carsley of whom he queried, "I'm under arrest, I guess." Agreeing, Sheriff Carsley told defendant that he had been involved in law enforcement work for a sufficient length of time to know what the charge would be. Defendant next relinquished a large pocket knife to Patrolman Grisham to whom he stated, "I was going to cut [Mrs. Mitchell's] throat and make Henry Lee watch her die, and then I was going to kill him." After Patrolman Gatewood was handed the M-2 rifle which Sheriff Carsley determined to have been recently fired, a .30-caliber cartridge was discovered within six feet of Mrs. Mitchell's body. Defendant consented to be taken to jail in Clarksdale where he arrived about 10:00 a.m. Having partaken of several more drinks of whisky, defendant was observed at this time to be "in pretty bad shape as far as drinking" was concerned; thereafter defendant went to sleep. In the meantime, the county coroner, who had carried the body to the funeral home, concluded that Mrs. Mitchell had been dead for approximately three hours and that there were no marks of violence upon her body other than from the bullet which had entered her neck from *847 the rear, traveled through her spinal cord and exited at her right jaw. A criminologist from the State Crime Laboratory microscopically ascertained that the cartridge found near Mrs. Mitchell's body had been ejected from the M-2 rifle surrendered by defendant to Patrolman Gatewood at the Lula Hunting Club during the morning of March 1, 1969.
The initial error assigned by defendant, the action of the trial court in overruling his motion to quash the indictment, is grounded in the assertion that there was a total departure from the statutory plan for the drawing of jurors. The term of court during which defendant was indicted began on Monday, August 25, 1969. Four days earlier the United States District Court had ordered the jury rolls, jury boxes and venire of Tunica County quashed because the names of the jurors had been unconstitutionally drawn. Said court also directed the circuit judge to have the sheriff prepare new lists in accordance with Mississippi Code 1942 Annotated section 1794 (1956). This section reads as follows:
If at any regular or special term of a circuit court it appear that jurors have not been drawn or summoned for the term, or for any part thereof, or that the jurors have been irregularly drawn or summoned, or that none of the jurors so drawn or summoned are in attendance, or not a sufficient number to make the grand jury and three petit juries, the court shall immediately cause the proper number of jurors to be drawn from the box and summoned, or, if there be not a jury-box to be drawn from, the court shall direct the requisite number of persons, qualified as jurors, to be summoned to appear at such time as the court shall appoint, and the court shall thereupon proceed as if the jurors had been regularly drawn and summoned.
Defendant maintains that the sheriff, who was duty-bound to investigate criminal cases and who had been a witness before the grand jury and was to be a witness in the trial of the present case, is not the proper official to be directed to summon prospective jurors under Section 1794. A somewhat similar question was before this Court in Flowers v. State, 209 Miss. 86, 41 So.2d 352 (1949), cert. denied, 339 U.S. 946, 70 S.Ct. 800, 94 L.Ed. 1360 (1950), wherein it was stated that the trial judge
* * * correctly held, after having quashed such panels as drawn from the so-called jury box, that in truth and in fact the county at that time had no regular jury box out of which to draw the names of jurors to take the place of the three panels which had been quashed. Thereupon, the court acted pursuant to Section 1794, Code 1942, by directing the requisite number of persons, qualified as jurors, to be summoned by the sheriff to appear forthwith to serve as petit jurors the same as if they had been regularly drawn and summoned. The statute expressly provides for this procedure "if there be not a jury-box to be drawn from." And the duty of the trial judge to follow this procedure is mandatory under the decision of J.W. Sanders Cotton Mills v. Moody, 191 Miss. 604, 2 So.2d 815. (209 Miss. at 94-95, 41 So.2d at 353).
Defendant asserts that the jurors should have been drawn pursuant to Mississippi Code 1942 Annotated section 1766 (Supp. 1968). However, Section 1766 is not applicable to the case at bar since, among other reasons, it is directory and not mandatory and since the thirty day period therein provided had not elapsed. Furthermore, even though certain procedures set out in Section 1794 are mandatory, Section 1798 of the Code provides:
All the provisions of law in relation to the listing, drawing, summoning and impaneling juries are directory merely; and a jury listed, drawn, summoned or impaneled, though in an informal or irregular manner, shall be deemed a legal jury after it shall have been impaneled and sworn; and shall have the power to *848 perform all the duties devolving on the jury.
In Wiggins v. State, 224 Miss. 414, 80 So.2d 17 (1955), this Court pronounced:
Section 1798, Code of 1942, provides that the provisions of law in relation to the listing, drawing, summoning, and impaneling of juries are directory merely and are not mandatory. We held [citations omitted] that a case will not be reversed unless there is a radical departure from the statutory scheme of summoning and impaneling juries. (224 Miss. at 418-419, 80 So.2d at 18).
Finding no radical departure from the statutory scheme, we are of the opinion that there was no error in the manner in which the jurors were drawn.
The next assignment of error involves the manner in which the petit jury was drawn. The comment of this Court regarding the first assignment of error applies with equal force to the petit jury which was not improperly drawn.
Assigning as error the action of the trial court in overruling his motion to quash the special venire, defendant contends that there was a total departure from the statutory method prescribed for the drawing of a special venire. He reasons that the venire was not lawfully drawn because the record fails to reflect that the trial judge ordered the circuit clerk to issue a special venire facias, and instead it reveals that the judge gave such orders directly to the sheriff. Mississippi Code 1942 Annotated section 1795 (1956), provides that the court may order to be issued by the clerk a special venire facias in which the sheriff is directed to summon the necessary number of jurors. This statute is by its terms directory. In Riley v. State, 208 Miss. 336, 44 So.2d 455 (1950) this Court held that a special venire will not be quashed except for fraud or a total departure from the procedure established in Section 1795. In our opinion there was neither such a departure nor fraud in the instant case.
It is further contended that the trial court erroneously permitted the State to successfully challenge jurors on the question of the death penalty after voir dire examination, and defendant cites Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). A careful examination of the record indicates that the trial judge and the attorneys understood the rule laid down in Witherspoon and its progeny. All of the jurors, which the court allowed the State to challenge for cause, stated either precisely or in substance that they would not consider voting for the death penalty under any circumstances. Moreover, since the death penalty was not inflicted in the case at bar, the verdict of guilty is not unconstitutionally rendered even had there been a violation of the Witherspoon rule. Rouse v. State, 222 So.2d 145 (Miss. 1969); Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). We are, therefore, of the opinion that there is no merit in this assignment of error.
Error is assigned in the admitting of the testimony of Sheriff Carsley and Patrolmen Gatewood and Grisham concerning defendant's statements from the time the officers arrived at the Bulk Plant until he was arrested at the scene of the crime. It is argued that defendant was not warned in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The statement of facts clearly reveals that the admissions of defendant were volunteered before he was arrested and before anyone had accused him of having committed a crime. In Miranda the United States Supreme Court announced that,
There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today. *849 (384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726).
Defendant also maintains that the same statements of Sheriff Carsley and Patrolmen Gatewood and Grisham were inadmissible because defendant was in a drunken condition. The evidence was ample to justify the finding that defendant was in full command of his faculties, that his intoxication was less than mania, that he fully understood and appreciated what he was saying and that his statements were free and voluntary. State v. Williams, 208 So.2d 172 (Miss. 1968).
Defendant also argues that the trial court erred in allowing the officers to testify concerning the circumstances and events which transpired at the Bulk Plant on the morning of the homicide. He contends that these events had nothing to do with the crime with which defendant was accused, were too remote and were prejudicial. In our opinion these facts were admissible as a relevant part of the factual situation surrounding the verbal statements which the defendant volunteered at the Bulk Plant and at the scene of the crime. Moreover, these statements of defendant and the surrounding facts which occurred only a short time after the death of Mrs. Mitchell, were directly related to connecting defendant with the death of Mrs. Mitchell. The statements made and the facts transpiring at the Bulk Plant and continuing until the arrest of defendant were admissible to show motive, intent and guilt. Pierce v. State, 213 So.2d 769 (Miss. 1968).
We find that there was no error in admitting in evidence the weapons taken from defendant when he was arrested at the scene of the crime. One was the carbine with which Mrs. Mitchell was shot. Another was Mrs. Mitchell's pistol which defendant stated he took from her before her death. The remaining two weapons were pistols which defendant was carrying until they were surrendered to Sheriff Carsley en route to the scene of the crime. The knife was the one to which defendant referred when he stated that he had intended to cut Mrs. Mitchell's throat and force Henry Lee to watch her die before killing him. There exists no valid reason for excluding these weapons from evidence.
The final proposition propounded by defendant is that on the issue of insanity the verdict of the jury and the judgment of the trial court is contrary to the overwhelming weight of the evidence and law. The pertinent testimony on this issue is as follows: Dr. George Ladner, a psychiatrist, who first saw defendant in jail on April 22, 1969, at the request of defense counsel, presented an extensive background history of defendant which was obtained during the more than sixty hours with defendant and from conversations with defendant's wife and others. Dr. Ladner stated that defendant, being a "loner" in a disturbed family situation, had experienced an unpleasant childhood; when he was sixteen he shot himself in the leg because, feeling that no one cared about him, he desired attention. Following the termination of an unsuccessful first marriage, defendant left farming in 1962 and commenced a career in law enforcement from which he received substantial satisfaction. During the summer of 1968, defendant, having personal financial difficulties, became angered by his father's purchase of a lake house which he "shot up" one night while drinking. Soon thereafter his father died and defendant experienced extreme guilt feelings for the lake house incident as well as for not having visited his father more often. While going through his father's personal effects, defendant discovered a 1942 judicial decree evidencing his adoption  a fact which he had not previously known. A state of deep depression was entered and defendant started drinking heavily. In February, 1969, defendant was named "Outstanding Patrolman of the Year" for having saved the life of a man trapped in a burning truck; later in the month he borrowed three thousand dollars in order to settle a damage suit filed by Henry Lee which resulted from the altercation over land. Having been informed *850 of his forthcoming transfer from Tunica to Columbia, defendant submitted a letter of resignation dated February 28, 1969, the same day that insurance money was received for the death of his father. Dr. Ladner described defendant as by this time having developed "a well organized paranoid delusional idea" that Henry Lee, Lee's attorney, Mrs. Mitchell and defendant's first wife were involved in a plot to get him out of Tunica. As to defendant's inability to recall anything after dancing at the aforementioned supper party except knocking upon Mrs. Mitchell's door and telling her that she and Henry Lee had killed Billy Moore and they were now dealing with Charles Ray Langdon, which was his name prior to adoption. Dr. Ladner characterized defendant as having undergone "depersonalization," a process of complete loss of identification. Dr. Ladner expressed the opinion that on the night of Mrs. Mitchell's death, defendant, suffering from an acute schizophrenic reaction, was out of contact with reality and unable to distinguish right from wrong.
Dr. Edwards, a psychiatrist who observed the defendant in early July, 1969, at Dr. Ladner's request, testified that defendant showed a residual from a psychotic episode on or about February 28, 1969, during which time defendant would have been unable to determine right from wrong. The head nurse in the psychiatric ward of Jackson's Baptist Hospital categorized defendant as the "sickest patient I've seen." Numerous other witnesses stated that defendant had undergone a personality change since becoming aware of his adoption and that his reputation for peace and violence was good so long as defendant remained sober.
On cross-examination of a defense witness and during rebuttal, considerable testimony was received that defendant did know the difference between right and wrong on February 28 and March 1, 1969. To refute the conclusion of Drs. Ladner and Edwards, such testimony was offered by: one of defendant's companions on the afternoon of February 28; one of the persons at the birthday supper party; Mrs. Roger Thomas who was at the Bulk Plant on the morning of March 1; Sheriff Carsley; and Patrolman Grisham. Dr. Glenn Anderson, a staff psychiatrist at the State Mental Hospital where defendant was under observation from March 10 to April 10, 1969, stated that it was his opinion that on the night of the crime that defendant knew the difference between right and wrong. Dr. Anderson noted that all of the general staff doctors diagnosed defendant to have been without psychosis or paranoid schizophrenia; the latter conclusion was supported by the corroborative testimony of Dr. James Stary who had administered certain objective intelligence and personality tests to defendant.
The test of legal insanity in Mississippi remains the M'Naghten rule of whether at the time the crime was committed the difference could be distinguished by the defendant between right and wrong. Harvey v. State, 207 So.2d 108 (Miss. 1968). Though the proof offered in the testimony of Drs. Ladner and Edwards who examined defendant more than one and a half months after Mrs. Mitchell's death was sufficient to raise the issue of defendant's sanity, such was in irreconcilable conflict with the testimony of Drs. Anderson and Stary who examined defendant less than two weeks after the killing and the testimony of the lay witnesses who actually observed defendant's conduct on February 28 and March 1. Therefore, the State presented ample evidence from which the jury could conclude beyond a reasonable doubt that defendant was sane at the time of the commission of the crime.
The other assignments of error are without merit and do not require discussion.
Finding no reversible error, we are of the opinion that the judgment of conviction should be affirmed.
Affirmed.
RODGERS, JONES, BRADY and SMITH, JJ., concur.