# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-00530-SCT

*JUSTIN LEE ANDERSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/12/2022 |
| TRIAL JUDGE: | HON. ANTHONY ALAN MOZINGO |
| TRIAL COURT ATTORNEYS: | SCOTT JOSEPH SCHWARTZ |
| | JEREMY LAWRENCE NECAISE |
| | TYLER HOWARD ALEXANDER |
| | MICHAEL ANTHONY WILLIAMS |
| | LAUREN BARNES HARLESS |
| | KIMBERLY THOMAS HARLIN |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: W. DANIEL HINCHCLIFF |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA BYRD |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/18/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., COLEMAN AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     On May 11, 2022, a jury convicted Justin Anderson of first degree murder for the killing of Michael McLendon. He was sentenced to life in prison. On appeal, Anderson challenges his conviction and sentence. Anderson argues that the trial court erred by denying

his heat of passion jury instruction, that the trial court committed plain error by allowing his confession to be presented to the jury and that the verdict was against the overwhelming weight of the evidence. Finding no error, this Court affirms Anderson's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2. The crime occurred on September 7, 2018, around lunchtime in Hattiesburg on the hill between Newk's Eatery and Red Lobster.

¶3. Rosemary Geauxtreaux, Anderson's mother, testified at trial. She and her husband, Robert Geauxtreaux had been panhandling that day on the corner by Newk's. According to Rosemary, Anderson and McLendon had been taking drugs together in the woods nearby when they joined the couple on the corner. They were all on the hill talking about one of McLendon's cars, and no one was fighting. McLendon, who was a family friend, was lying in a resting position on his elbows on the grassy knoll behind Rosemary. Anderson and Robert were sharing a seat on a milk crate behind Rosemary, who was holding the sign. She testified that McLendon and Anderson had been playing with a gun and pointing it at each other and that she "had been telling them all day to put it up." Then she heard what she thought was a firecracker. Anderson and Robert told Rosemary to run, and when she asked why, Robert told her that Anderson had shot McLendon. Rosemary then called the police.[1] Rosemary told the jury that she knew Anderson had accidentally shot McLendon.[2]

---

[1] A recording of the call was played for the jury and admitted into evidence.

[2] The State's objection to this statement was sustained on the basis that Rosemary was speculating because she previously testified that her back was turned and that she did not

2

¶4.     Portions of Rosemary's testimony were impeached with a prior recorded police statement.[3]  The State showed that Rosemary did not tell the police that Anderson and McLendon had been playing with a gun or that Rosemary had told them to put the gun away.  Additionally, Rosemary's statements were inconsistent as to the length of time that she had spent with Anderson and McLendon prior to the incident.

¶5.     Kevin Fitzpatrick, the owner of the Hattiesburg Newk's, testified at trial that he and Max McGehee, the general manager, had been on the patio on the day of the incident going over financial documents. Fitzpatrick observed a transient man, later identified as Anderson, walk past the restaurant and meet with another man who appeared from behind the building. He watched as the two men joined an older couple sitting on a hill behind the Red Lobster that was visible from the Newk's patio.  Anderson and one of the men started talking loudly. and then Fitzpatrick heard what he thought was a firecracker.  He saw three people run off the hill and then realized someone had been shot because he only saw the feet of the fourth person on the hill.  Fitzpatrick heard the female in the group hysterically ask Anderson why he shot the other man, and Anderson responded with "the MF'er wouldn't leave me alone."

¶6.     McGehee also testified at trial that he had been sitting outside discussing financial reports with Fitzpatrick, his boss, when he saw Anderson walk past the restaurant.  Another male emerged from behind the building a few seconds later and began talking with Anderson.  McGehee noticed the two men walk up the hill between Newk's and Red Lobster where an

actually see what had happened.

[3]Rosemary's inconsistent statement to the police was not admitted into evidence because it was used for impeachment purposes only.

older man and woman were located. He heard "some voices get a little louder" and then a sound that was either a gun or a firecracker. McGehee witnessed the woman and two of the men run off the hill and then the woman tried to hit Anderson. McGehee stated that it was at this point that he decided to call the police because he did not want to allow a physical altercation between the two restaurants. He went inside to call 911. After the phone call, he noticed Sergeant Lashaunda Buckhalter and a table of officers having lunch in the restaurant. He repeated the information to them, and they responded to the incident.

¶7.    Lashaunda Buckhalter, a sergeant at the Hattiesburg police department, testified at trial that she and other officers were having lunch at Newk's when they were approached by McGehee. McGehee told the officers that he had "witnessed an argument going on outside the business at that time" and that he had heard what he thought was a gunshot or a firework. Sergeant Buckhalter began responding to the accident by activating her body-worn camera and proceeding outside.[4]  Once outside, she observed Anderson sitting on the sidewalk, crying with his hands on his head and a cigarette in his mouth; McLendon was lying on the ground face down with what appeared to be blood coming from his head; Rosemary was standing and screaming; and Robert standing on the side of the curb. Sergeant Buckhalter testified that Rosemary was screaming that Anderson had shot McLendon in the head. Rosemary, Anderson and Robert were handcuffed while first responders arrived and attended to McLendon. McLendon was taken to the hospital where he later died from his gunshot

---

[4]The jury was shown Sergeant Buckhalter's body camera footage, and it was admitted into evidence.

4

wound.  Anderson was read his *Miranda*[5] rights and placed in the back of a patrol car, which transported him to the Hattiesburg Police Department.  The gun, which was unloaded and sitting on the curb when the officers arrived, was taken into police custody.

¶8.     Detective Jeremy Dunaway, an investigator at the Hattiesburg Police Department, testified that when he interviewed Anderson at the police station, Anderson confessed to shooting someone in the head.

¶9.     The State's forensic pathologist testified that the cause of death was a gunshot wound to the head and the manner of death was homicide.  Lori Beall, a forensic scientist specializing in firearm identification, testified that the bullets found in the victim's head were consistent with the .22-caliber handgun found at the scene.

¶10.    The defense called Lenny Wychelewski, a drywaller who employed Anderson. Wychelewski testified that, on the day of the incident, he went to pick Anderson up for work but noticed that he "appeared high and like he hadn't had sleep."  Wychelewski told Anderson to stay home from work based on his observation of Anderson's appearance.

¶11.    The jury was instructed on the theory of first degree murder and the lesser-included offenses of second degree murder, culpable negligence and the elements of each.  The jury convicted Anderson of first degree murder, and he was sentenced to life in prison.  After trial, Anderson filed a motion for judgment notwithstanding the verdict or a new trial, which was denied.

---

[5]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

## ISSUES PRESENTED

¶12.    Anderson appeals to this Court, raising the following issues:

I.      Whether the court erred by refusing a heat of passion manslaughter jury instruction.

II.     Whether the court committed plain error by allowing evidence of Anderson's confession.

III.    Whether the verdict was contrary to the overwhelming weight of the evidence.

## ANALYSIS

**I.      Whether the court erred by refusing a heat of passion manslaughter jury instruction.**

¶13.    In general, the grant or denial of a proposed jury instruction is reviewed for abuse of discretion. *Quinn v. State*, 191 So. 3d 1227, 1233-32 (Miss. 2016) (citing *Victory v. State*, 83 So. 3d 370, 373 (Miss. 2012)). This includes the Court's granting of a lesser-included-offense instruction. *Clark v. State*, 315 So. 3d 987, 994, 1004 (Miss. 2021). This Court has, however, stated the following:

> We review a trial judge's denial of a lesser-included-offense jury instruction de novo. While "[a] defendant is entitled to have jury instructions given which present his theory of the case," we have held that "the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." To be entitled to a lesser-included offense instruction, "a defendant must point to some evidence in the record from which a jury reasonably could find him not guilty of the crime with which he was charged and at the same time find him guilty of a lesser-included offense." We must view the evidence in the light most favorable to the defendant, draw all reasonable inferences in his favor, and take into account "that the jury may not be required to believe any evidence offered by the State." But if no reasonable jury could have found the defendant guilty of the lesser-included offense, we will uphold the denial of the proposed instruction.

*Gilmore v. State*, 119 So. 3d 278, 286 (Miss. 2013) (citations omitted). It is well settled that "manslaughter is a lesser-included offense of murder." *Shumpert v. State*, 935 So. 2d 962, 968 (Miss. 2006) (quoting *State v. Shaw*, 880 So. 2d 296, 304 (Miss. 2004)).

¶14. The refusal of a lesser-included-offense instruction is proper if, when taking all evidence in the light most favorable to the accused, and considering all reasonable favorable inferences in favor of the accused, the jury could not have convicted. *Hester v. State*, 602 So. 2d 869, 873 (Miss. 1992) (quoting *Fairchild v. State*, 459 So. 2d 793, 801 (Miss. 1984)). Heat of passion manslaughter is defined by Mississippi Code Section 97-3-35 (Rev. 2020) as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense[.]" Heat of passion is defined by caselaw as

> *[a] state of violent and uncontrollable rage engendered by a blow or certain other provocation given*, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, *by words or acts of one at the time*. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*McCune v. State*, 989 So. 2d 310, 319 (Miss. 2008) (alteration in original) (quoting *Agnew v. State*, 783 So. 2d 699, 703 (Miss. 2001)).

¶15. Anderson argues that the trial court erred by denying his proposed heat of passion jury instruction because he was entitled to present his theory of the case to the jury. *Craig v. State*, 660 So. 2d 1298, 1301 (Miss. 1995) ("A defendant is entitled to present their theory of the case to the jury so long as there is some evidentiary basis, even if the evidence is insufficient or of doubtful credibility[.]" (citing *Welch v. State*, 566 So. 2d 680, 684 (Miss.

7

1990))). Anderson further argues that he was constitutionally presumed innocent and should have been given the benefit of the doubt. ***Davis v. State***, 18 So. 3d 842, 847 (Miss. 2009) ("Finally, when serious doubt exists as to whether an instruction should be included, the doubt should be resolved in favor of the accused." (citing ***Stringfellow v. State***, 595 So. 2d 1320, 1322 (Miss. 1992), *overruled on other grounds by **Nevels v. State***, 325 So. 3d 627, 634 (Miss. 2021))).

¶16. Anderson submitted a proposed jury instruction for heat of passion manslaughter to the trial court and argued that the evidence presented a "situation of rising and elevated emotions and passions." He relies on the testimony of McGehee and Fitzpatrick, who heard Anderson and McLendon talking loudly. McGehee testified that he heard loud talking and his attention was diverted back to the hill where Anderson was located because there was an elevation in the voices before the gunshot. Fitzpatrick testified: "they started talking. Then they started arguing, just loud talk. I don't know what was said. I don't know who -- I didn't hear that, but it was just loud." Anderson further argues that Fitzpatrick's statement that, after the gunshot, he heard Anderson tell Rosemary "he wouldn't quit messing with me" is proof that McLendon provoked Anderson.

¶17. The State argues that the evidence did not support a heat of passion instruction and that Anderson mischaracterizes the testimony of the witnesses. The State points out that McGehee testified that neither Anderson nor McLendon seemed mad when he saw them meet in front of the patio; they were just talking. The State further argues that Fitzpatrick stated that although he heard loud talking, he was not alarmed until later when he heard what

8

he thought was a firecracker. Fitzpatrick also stated that he did not see any physical altercation; they were just talking.

¶18. The refusal of a lesser-included-offense instruction was proper because, when taking all evidence in the light most favorable to Anderson and considering all reasonable favorable inferences in favor of Anderson, the jury could not have convicted him of heat of passion manslaughter. *Hester*, 602 So. 2d at 873. There is no proof of "[p]assion or anger suddenly aroused at the time by some *immediate and reasonable* provocation[.]" *McCune*, 989 So. 2d at 319 (alteration in original) (quoting *Agnew*, 783 So. 2d at 703). At best, the evidence supports a finding that Anderson and McLendon were having a conversation that was either an argument or heated discussion. But this Court has "stated that words alone and disagreements among people are not enough to invoke the passion required for this defense." *Phillips v. State*, 794 So. 2d 1034, 1037 (Miss. 2001). Rosemary, who was the closest witness at the time of the accident, testified that no one was fighting. No one witnessed the shooting, no one testified regarding Anderson and McLendon's state of mind and Anderson chose not to testify as to his emotional state. Although Anderson's comment that McLendon would not quit messing with him suggests there may have been a disagreement, there is no evidence of anything other than words alone, which is insufficient. *Id.*

¶19. *Tait v. State*, 669 So. 2d 85 (Miss. 1996), is instructive. In *Tait*, a group of men were hanging out in an apartment. *Id.* at 87. "All that day, Tim [Tait] and Chris [Cannon] were playing with a gun." *Id.* Tait asked Cannon if he could wear a bracelet he had found in the apartment, and Cannon told him no. *Id.* The two boys started "joking around and

9

horseplaying. Tim grabbed the gun and cocked it. He put it to [Cannon's] head, and the gun went off." *Id.* One of the other boys witnessed the event and "ran outside and told the others to call the ambulance." *Id.* When first responders arrived, Tait was on the ground holding Cannon's head sobbing and admitting to having killed him. *Id.*

¶20. At Tait's trial, the jury was given instructions on heat of passion manslaughter as well as depraved heart murder. *Id.* at 88-89. On appeal, Tait challenged his conviction by arguing that if he was guilty of anything, it was culpable negligence. *Id.* at 88. The Court found that the uncontroverted evidence from which Tait was convicted came from a single eyewitness and did not suggest anything other than "the two were merely joking around and horseplaying about the bracelet." *Id.* at 89-90. Accordingly, the Court found that the grant of a heat of passion instruction was erroneous because there was no proof that Tait and Cannon were in a "state of violent and uncontrolled rage engendered by a blow or certain other provocation given." *Id.* at 90 (internal quotation marks omitted) (quoting *Buchanan v. State*, 567 So. 2d 194, 197 (Miss. 1990)).

¶21. Similarly, the proof in this case does not suggest that Anderson and McLendon, who were friends spending time together, doing drugs and playing with a gun, were in a state of violent and uncontrolled rage at the time of the incident. Further, there is less proof of a physical altercation in Anderson's case than there was in the *Tait* "horseplay[.]" *Id.* at 87.

¶22. Like *Tait*, the only lesser-included-offense instruction with any support in the evidence would be a culpable negligence instruction. *Id.* at 88.The Court in *Tait* noted that factually similar cases, i.e., in which people are flippantly pointing guns at one another, are

10

usually considered in the context of culpable negligence manslaughter. *Id.* at 91. Unlike *Tait*, Anderson was granted a culpable negligence jury instruction that stated:

> The Court instructs the jury that culpable negligence within the meaning of the statute is that degree of negligence or carelessness which is denominated as gross negligence and which constitutes such a departure from what would be the conduct of an ordinarily careful and prudent man under [the] same circumstances as to furnish evidence of indifference to consequences.

There was evidence to support this instruction such as Rosemary's testimony and Anderson's sitting on the curb crying when the police arrived. *See id.* at 90 ("Tait's conduct of falling to the ground and crying following the shooting could be considered as consistent with an accident."). Although they were properly instructed, the jury clearly did not buy this theory because they convicted Anderson of first degree murder. The evidence does support a first degree murder conviction. Anderson was not deprived of his right to submit his theory of the case to the jury, and under this Court's caselaw, the facts of this case were appropriately considered under the theory of culpable negligence manslaughter. *Id.* at 91.

¶23. Anderson further argues that the instructions given did not fit with the facts because there was no proof of deliberate design. Anderson submits that the "fact that [Anderson and McLendon] were not initially antagonistic, belied the notion that there existed any premeditation." Instead, Anderson suggests that the "bulk of the evidence showed two impaired men engaging in an escalating confrontation."

¶24. We disagree. No reasonable jury could have found Anderson guilty of heat of passion manslaughter because the proof showed the two were merely conversing, and this Court requires more than mere words to justify instructing the jury on heat of passion. *Phillips*, 794

11

So. 2d at 1037. Additionally, deliberate design "may be 'formed quickly,' even 'moments before the act' and may[ ]be inferred from the use of a deadly weapon." *Sands v. State*, 62 So. 3d 374, 378-79 (Miss. 2011) (quoting *Wilson v. State*, 936 So. 2d 357, 363-64 (Miss. 2006)). The trial court did not err by denying Anderson's heat of passion manslaughter instruction.

**II.      Whether the court committed plain error by allowing evidence of Anderson's confession.**

¶25.      Anderson argues that his confession was given in violation of his *Miranda* rights because his intoxication rendered him unable to understand his constitutional protections. Anderson did not raise this issue at trial and asks this Court for relief based on plain error. "Plain error exists where such error affects the defendant's substantive/fundamental rights, even though no objection was made at trial." *Parker v. State*, 30 So. 3d 1222, 1227 (Miss. 2010). "To determine if plain error has occurred, we must determine 'if the trial court has deviated from a legal rule, whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial." *McGee v. State*, 953 So. 2d 211, 215 (Miss. 2007) (quoting *Cox v. State*, 793 So. 2d 591, 597 (Miss. 2001)).

¶26.      Sergeant Buckhalter testified that Anderson was advised of his rights when he was placed in the police car and transported to the station. Detective Dunaway testified that when he entered the interview room, Anderson was sitting on the floor under the table. Dunaway joined Anderson on the floor and testified at trial that the following conversation took place:

> I told him that, you know, I wanted to speak to him about the incident to find out what was going on, but prior to doing that, I'd have to go over his Miranda rights with him. He'd have to waive his rights to where I could ask any

12

questions. We proceeded to talk. It was during that time, he stated that we couldn't help him. He talked about [how] he was going to go back to jail. At that time I told him, we wasn't sure what was going on, and why he was indicating he'd go back to jail, and he spontaneously stated that he had shot somebody in the head. After that we continued to try to go over the Miranda form with him, but he refused, and wasn't long after that the interview ended.

Anderson also told Dunaway that he was tired of people messing with him. Toward the end of the interview, Anderson accused Dunaway of winking at him, but Dunaway stated that he was not winking.

¶27. Anderson argues that Dunaway's testimony shows that Anderson was intoxicated and therefore unable to understand his rights. Anderson further relies on Rosemary's testimony that Anderson and McLendon had been "doing dope" in the woods and "talking crazy out of their heads" while playing with a gun to prove that he was not acting rationally.

¶28. The State argues that Anderson's statement was spontaneously given before interrogation had begun. Further, the State argues that even if Anderson was intoxicated, his confession is admissible. *O'Halloran v. State*, 731 So. 2d 565, 571 (Miss. 1999) ("[i]ntoxication or sickness does not automatically render a confession involuntary." (alteration in original) (quoting *Johnson v. State*, 511 So. 2d 1360, 1365 (Miss. 1987))). "The admissibility of a confession depends on the degree of intoxication." *Id.* (internal quotation marks omitted) (quoting *Johnson*, 511 So. 2d at 1365).

¶29. This Court finds that the inclusion of Anderson's confession into evidence did not amount to plain error. This Court has found that a confession is admissible, despite the defendant's intoxication, when it is clear that he "fully understood and appreciated what he was saying and that his statements were free and voluntary." *Moore v. State*, 237 So. 2d 844,

849 (Miss. 1970) (citing *State v. Williams*, 208 So. 2d 172, 175-76 (Miss. 1968)). The evidence supports a finding that Anderson fully understood that he was voluntarily admitting to Dunaway that he shot McLendon. Although his behavior was strange, there is no evidence that he was intoxicated to the point that his mental faculties were affected. Anderson was aware enough to converse with Dunaway and later invoke his rights.

¶30. The voluntariness of a waiver, or of a confession, is a factual inquiry for the trial court that will not be disturbed unless it appears clearly contrary to the overwhelming weight of the evidence. *Johnson*, 511 So. 2d at 1365. By not objecting, Anderson never gave the trial court the opportunity to make such an inquiry. Therefore, under a plain error analysis, Anderson's behavior is sufficient to evidence that he fully understood and appreciated what he was saying. It is not "plain, clear or obvious" that Anderson's constitutional protections were violated. *McGee*, 953 So. 2d at 215 (quoting *Cox*, 793 So. 2d at 597).

¶31. Nevertheless, even if there was error, it did not prejudice the outcome of the trial. *Id.* Anderson's confession was cumulative of other evidence. Rosemary testified that Anderson shot McLendon; multiple witnesses observed Rosemary screaming accusations at Anderson; Fitzpatrick overheard Anderson's response to Rosemary as to why he shot McLendon; Sergeant Buckhalter's body camera showed Rosemary screaming that Anderson shot McLendon; and the 911 call contained further accusations by Rosemary that her son had shot someone in the head. In fact, Anderson states that it was his trial strategy to "concede all but the state of mind of Justin Lee Anderson."

> ### III. Whether the verdict was contrary to the overwhelming weight of the evidence.

14

¶32. "The jury is the sole judge of the weight and worth of evidence and witness credibility." *Williams v. State*, 305 So. 3d 1122, 1130 (Miss. 2020) (internal quotation marks omitted) (quoting *Williams v. State*, 285 So. 3d 156, 160 (Miss. 2019))). When reviewing a challenge to the weight of the evidence, all evidence should be weighed in the light most favorable to the verdict, and the conviction should not be overturned unless it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)). When reviewing the jury verdict, all inferences must be drawn in favor of the State. *Fleming v. State*, 732 So. 2d 172, 183 (Miss. 1999) (citing *Jones v. State*, 635 So. 2d 884, 887 (Miss. 1994)).

¶33. Anderson reincorporates his arguments from the first issue, and further argues that the facts of this case strongly support a manslaughter charge. Anderson argues that the culpable negligence instruction did not fit the facts and that the jury was "faced with one option, to release the defendant or convict him of murder." He argues that it is impossible to know beyond mere speculation what happened on the hill between Anderson and McLendon. *See Clemons v. State*, 473 So. 2d 943, 945 (Miss. 1985) (finding that "from the record there is more than enough conflicting evidence to cast at least a reasonable doubt, as to murder" and remanding case for sentencing on the charge of manslaughter). Anderson requests that this Court remand the case for a new trial or sentencing for the crime of manslaughter.

¶34. Anderson argues that his case is similar to *Dedeaux v. State*, 630 So. 2d 30 (Miss. 1993). In *Dedeaux*, which was defined by the Court as "the typical 'juke joint'

confrontation:" Kim Turner was at a bar with Willie Dedeaux, a man she was living with, when her husband Luke Turner approached her to discuss their children. *Id.* at 31. "While [Luke] Turner was talking to Kim, Dedeaux 'came up and grabbed Kim' and told her to come inside." *Id.* A verbal and physical disagreement between Luke and Dedeaux ensued in the parking lot. *Id.* Dedeaux's mother joined the fight with a gun, which Dedeaux used to shoot and kill Luke. *Id.* at 32.

¶35. At trial, Dedeaux objected to the inclusion of a manslaughter instruction despite the State's insistence that the trial court should grant one. *Id.* Dedeaux was convicted of murder. *Id.* Dedeaux appealed and argued that the failure to include the instruction was error. *Id.* On appeal, the Court evaluated the denial of the manslaughter instruction for manifest injustice and decided that, although Dedeaux used a greater amount of force than necessary, "[t]his clearly was a killing in the heat of passion[.]" *Id.* at 33. The Court reversed the jury conviction and remanded the case for sentencing for the crime of manslaughter. *Id.*

¶36. Anderson's case is, however, distinguishable from ***Dedeaux***. In ***Dedeaux*** multiple witnesses saw the physical altercation between a man and his wife's partner. *Id.* at 31-32. In addition, witnesses testified about hearing Dedeaux tell his mother, "I'm tired of this guy picking at me[.]" *Id.* at 32. Dedeaux testified that Luke "had something in his hand that 'he reached back' for and threatened him stating: 'I've been promising you this and I am going to give it to you.'" *Id.* In the present case, witnesses heard Anderson state that "the MF'er wouldn't leave me alone" but otherwise there was no proof of provocation or physical altercation. "Mere words, no matter how provocative, are insufficient to reduce an

16

intentional and unjustifiable homicide from murder to manslaughter." *Abeyta v. State*, 137 So. 3d 305, 311 (Miss. 2014) (internal quotation marks omitted) (quoting *Phillips v. State*, 794 So. 2d 1034, 1037 (Miss. 2001)).

¶37. Anderson also argues that this Court should take into consideration his and McLendon's intoxication because it is indicative of their state of mind. Anderson suggests that the parties intoxication in *Dedeaux* factored significantly in the Court's decision to find Dedeaux guilty of manslaughter instead of murder. Although the Court noted that Turner was drunk upon arrival, the Court in *Dedeaux* did not rely on the degree of intoxication of Dedeaux or Turner when making its finding. *Dedeaux*, 630 So. 2d at 31. This is understandable because the standard for heat of passion and murder is not subjective. It asks whether a normal mind would have been provoked. *Abeyta*, 137 So. 3d at 310-11. Anderson's intoxication is irrelevant to these issues. *See Hutto v. State*, 227 So. 3d 963, 987 (Miss. 2017) ("*voluntary* intoxication is not a defense to a specific-intent crime." (internal quotation mark omitted) (alteration in original) (quoting *Hale v. State*, 191 So. 3d 719, 724 (Miss. 2016))).

¶38. This Court finds that Anderson's conviction is not against the overwhelming weight of the evidence. Anderson was convicted of first degree murder, which is "[t]he killing of a human being without the authority of law . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being[.]" Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2020). It was shown at trial that Anderson and McLendon came out of the woods from where they were taking drugs and met with Rosemary and Robert to panhandle. Rosemary

17

testified that no one was fighting while they were sitting on the Newk's corner talking and "flying a sign." Witnesses overheard what was characterized as loud talking or arguing. Rosemary told the jury that Anderson and McLendon had been playing with a gun all day. Witnesses testified to hearing what they thought was a gunshot or a firecracker. Robert, Rosemary and Anderson were seen running off the hill in response to the noise, and Robert told Rosemary that Anderson had shot McLendon. Rosemary began screaming at Anderson, asking him why he shot McLendon. Witnesses observed the interaction between Rosemary and Anderson and heard Anderson respond that "the MF'er wouldn't leave me alone." The jury heard Rosemary's 911 call in which she yelled that her son had shot someone in the head. Sergeant Buckhalter's body camera footage evidenced Rosemary yelling, "he did it, he did it" while Anderson sat on the curb and cried. Officers testified that at the police station Anderson admitted to having "shot somebody in the head." The medical examiner testified that this was a homicide, and an examination of the gun revealed the bullets found at the murder scene were consistent with the gun found at the scene.

¶39. Evidence was introduced by Anderson that he might have been high and intoxicated on the day of the murder. Anderson, however, failed to show how this evidence would be relevant to these issues.

¶40. Although there is little proof of deliberate design, this Court has stated that deliberate design "may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Bernard v. State*, 288 So. 3d 301, 306 (Miss. 2019) (internal quotation mark omitted) (quoting *Brown v. State*, 965 So. 2d 1023, 1030 (Miss. 2007)).

18

Anderson challenged the State's proof on deliberate design in front of the jury. If the jury had agreed with Anderson's argument, then they could have chosen a different verdict, or they could have acquitted. It is not this Court's job to reweigh the evidence. *See Williams*, 305 So. 3d at 1130. After reviewing this jury verdict and drawing all inference in favor of the State, Anderson's conviction is not against the overwhelming weight of evidence. *Fleming*, 732 So. 2d at 183.

## CONCLUSION

¶41. Anderson's conviction of first degree murder and sentence of life in prison are affirmed.

¶42. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR.**

19