630 So.2d 30 (1993)
Willie Lee DEDEAUX
v.
STATE of Mississippi.
No. 91-KA-0164.
Supreme Court of Mississippi.
November 24, 1993.
*31 James L. Davis, III, Gulfport, for appellant.
Michael C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
SMITH, Justice, for the Court:
Willie Lee Dedeaux appeals his conviction of murder and sentence of life imprisonment from the Circuit Court of the First Judicial District of Harrison County. While the evidence presented does not support a conviction of murder, the Court finds that it does support the lesser charge of manslaughter. Because the evidence in this case clearly indicates that Willie Lee Dedeaux killed Luke Turner without malice or premeditation and without justification, this case will be reversed and remanded for resentencing for manslaughter.

FACTS
The case at bar is representative of the typical "juke joint" confrontation: a marriage gone sour, too much booze consumed, an angry husband and a wife's new found live-in boy friend. Luke and Kim Turner were husband and wife, separated, but not divorced. Kim was living with Willie Lee Dedeaux. Turner arrived at Isabell's Lounge at approximately 10:30 p.m. accompanied by Ricardo Lizana. The testimony revealed that Luke and Ricardo had been doing some powerful drinking since 4:00 p.m. Their six and one half hour consumption spree, which staggers the imagination, consisted of the following:
(1) a fifth of "Mad Dog"
(2) a fifth of gin
(3) a fifth of "Thunderbird"
(4) a fifth of "Seagrams 7"
(5) a fifth of "Taca Vodka"
To say Luke Turner was drunk upon arrival at Isabell's would be putting it mildly. His first act inside the premises was to drink from a pitcher of beer, which belonged to someone else.
When Turner saw his estranged wife Kim, he asked her to accompany him outside so that they could discuss their children. While Turner was talking to Kim, Dedeaux "came up and grabbed Kim" and told her to come inside. When Kim asked Dedeaux to let her talk to Luke a few more minutes, Dedeaux told Luke that "he would whip his mother-fucking ass." The confrontation between Dedeaux and Luke was arguably initiated by Dedeaux. Although there is testimony that Luke was an aggressor in this case, Dedeaux clearly started this incident. However, this does not excuse or justify the killing of Luke. While Luke may be characterized as the aggressor in the events leading up to his death, what is even more clear is that Dedeaux used more force than was necessary under the circumstances.
Luke's sister, Toni Brown, testified that if the two men had fought, there would have been just one bloody nose and she doubted that it would have been Luke's. "But one thing that I wouldn't do that Dedeaux did was tell no man twice my size that I was going to beat him ..."
Also typical of juke joint shootings is the inconsistent testimony given by various witnesses. Dedeaux's mother, Carolyn Dedeaux Lee, a waitress at Isabell's, gave very conflicting testimony at trial which conflicted with her original statement given to the police. Her statement was admitted into evidence as Exhibit 3. She testified at trial, "I didn't tell them that ... it is in disagreement." Immediately the State produced a tape recording of her statement, and the jury was allowed to hear exactly what she originally told the police, and compare the tape with the written statement.
Carolyn's statement given to the police on the night of the incident contained the following:

*32 "and ah Willie say ah where your car keys, and so I got the car keys and I said what you want with my car keys, he said I need something, he said cause I'm tired of this guy picking at me, way he picks at me, so, so I went outside and I had the keys and I did like that to the truck, so Willie took the keys and he unlocked the trunk, and so my little bag, it stays behind the spare tire, so I got the bag and Willie grabbed the bag and I grabbed the bag back, so I unzipped the bag and he said give me that, and he took the bag and unzipped it, so I said give me the bag back and I had a empty bag so I put it down and I grabbed back the gun and the guy was chasing him on around, so somebody said, I didn't shot straight up in the air and Willie snatched it and so I had the keys still in the trunk, when I went back inside I forgot my keys on the trunk of the car, and I thought about it, I didn't have my keys in my pocket, and I went back out there to get the keys, so I was trying to get the gun away from Willie, he say, give me the gun, and the guy was steady coming, so I don't know, I, it happened so fast I can't remember how many shots was fired, but Minnie told me that she heard three." (emphasis added)
Carolyn's testimony at trial totally contradicts this statement given to the police the night of the incident. The jury obviously did not ignore her prior statement.
Willie Lee Dedeaux claimed Luke had something in his hand that "he reached back" for and threatened him stating: "I've been promising you this and I am going to give it to you."
Dedeaux claimed that while Luke was chasing him around the cars, his mother got her gun out of the trunk of her car and fired one shot into the ground. Dedeaux stated, "I ran up to her from behind her snatched the gun ... and then just shot." Other witnesses testified that Carolyn shot up into the air and that they saw her give the gun to Dedeaux, rather than his grabbing the gun from her.
Carolyn ended up with the gun in her purse. She also failed to tell police initially of the gun's whereabouts. Additionally, she told Dedeaux to leave the premises, after the killing.
A review of Carolyn's statements to police, her testimony at trial and Dedeaux's testimony indicate why the jury convicted Dedeaux of murder. Dedeaux knew the gun was in the trunk of his mother's car and he intended to use it on Luke. He actually had the gun in his hands prior to his mother's ever touching it.
Sgt. Bill Collins, Harrison County Sheriff's Office, searched the scene and did not find any weapon on Luke's body. Collins was unable to obtain any information concerning any prior threats by Luke against Dedeaux.
Kim Luke admitted that when Dedeaux fired the first shot at Luke, Luke was walking towards Dedeaux. Luke fell when the second bullet hit him. The next obvious question is: where was Luke's body when the third bullet was fired? Even more puzzling is the question of why Dedeaux fired a third bullet after Luke had fallen? A case could be made for the jury's murder verdict; however, this case is weak. The trial judge thought the case lacking in proof of murder also.
Even the assistant district attorney had second thoughts. An alleged discovery violation had been committed by the defense for failure to disclose their witnesses to the State until the day of trial. The trial judge allowed the State an interview to question the defense witnesses before continuing with the trial. The assistant district attorney told the court that, had he known about these witnesses, he would have proceeded under a theory of manslaughter. Indeed, the record confirms that the State insisted that the trial judge grant a manslaughter instruction. The defense objected at trial to such an instruction being granted, but now raises this issue for consideration on appeal.
Dedeaux appeals to this Court and presents six issues all of which are without merit except issue III which warrants discussion. Issue III is as follows:

WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO GRANT S-5, THE

*33 STATE'S MANSLAUGHTER INSTRUCTION.

DISCUSSION OF ISSUES AND LAW
"Our law is well settled that jury instructions are not given unless there is an evidentiary basis in the record for such." Davis v. Davis, 530 So.2d 694, 701 (Miss. 1988).
Dedeaux's case hinged upon the element of self-defense. Dedeaux now asserts it was error to deny the manslaughter instruction. Dedeaux is now represented by different counsel. One might normally view the decision of the trial defense counsel to refuse the manslaughter instruction as trial strategy, and viewed as such the issue would be clearly barred on appeal. Moawad v. State, 531 So.2d 632, 635 (Miss. 1988); Cummins v. State, 515 So.2d 869, 872 (Miss. 1987). However, where it appears from the record in its entirety that there has been a miscarriage of justice, this Court applies Mississippi Supreme Court Rule 28(a)(3) to prevent manifest injustice. Cummins v. State, 515 So.2d at 876, 877 also addressed whether the trial court was in error for refusing to instruct the jury:
The State's instructions were offered without any objection ... In the absence of an objection at trial, this Court will examine only to prevent manifest injustice... . Gates v. State, 484 So.2d 1002 (Miss. 1986); Shelton v. State, 445 So.2d 844 (Miss. 1984)
In light of the evidence reflected in the record, the murder conviction in the case sub judice appears to rise to the level of manifest injustice.
The jury heard all the testimony and obviously rejected Dedeaux's self-defense argument. Although strategically the manslaughter instruction was rejected by Dedeaux, this decision does not detract from the jury's finding and from the testimony at trial that Dedeaux unlawfully took the life of Luke. To discharge the defendant cannot be justified.
In Wells v. State, 305 So.2d 333, 339-340 (Miss. 1974), the Court held:
In the case at bar, when the jury found the defendant guilty of murder, it necessarily found that defendant was guilty of homicide which was not justifiable or excusable, thus rejecting the defense of self defense and accident. If the case is remanded for a new trial on the indictment, the defendant would thereby be permitted to present to a second jury his defenses which were rejected by the first jury. We see no sound reason to remand for a new trial and thereby require the defendant to again be convicted of manslaughter before being punished.
In Clemons v. State, 473 So.2d 943 (Miss. 1985), this Court held that the facts would not support a conviction of murder but the evidence did establish guilt of manslaughter. The case was remanded for resentencing for the crime of manslaughter. Accord Bradley v. State, 413 So.2d 725 (Miss. 1982).

CONCLUSION
Applying the law set forth in Wells and Clemons to the facts in the case sub judice, the same result should be reached. The facts herein clearly support manslaughter. According to all witnesses at trial, Luke was unarmed. According to the police investigators, both Luke's body and the area around it did not reveal any weapon. Dedeaux unlocked the trunk to his mother's car according to her statement. Dedeaux knew the gun was in the trunk. He intended to get the gun and use it against Luke. According to Carolyn's statement, Dedeaux actually had his hands on the gun prior to her getting it away from him and firing the first shot. Dedeaux used a greater amount of force than necessary under the circumstances. This clearly was a killing in the heat of passion. This Court will follow its holdings in Wells and Clemons, and reverse and remand for resentencing for the crime of manslaughter.
REVERSED AND REMANDED FOR RESENTENCING.
PRATHER, P.J., and PITTMAN, McRAE and JAMES L. ROBERTS, Jr., JJ., concur.
HAWKINS, C.J., dissents with separate written opinion joined by DAN M. LEE, P.J., and SULLIVAN, J.
*34 BANKS, J., concurs in part, dissents in part with a separate written opinion.
HAWKINS, Chief Justice, dissenting:
I respectfully dissent.
The dispositive issue on this appeal is whether or not the State proved beyond a reasonable doubt that Dedeaux was not acting in reasonable necessary self-defense when he shot Luke Turner. That was the State's burden; it failed. When I say "proved," I do not mean conjecture or surmise, but competent testimony. Why is it that the State failed to prove beyond a reasonable doubt that this slaying was not in necessary self-defense? Miss. Code Ann. § 97-3-15 makes the killing of a human being justifiable in various factual situations. One of these is "when committed in the lawful defense of one's own person ... where there shall be reasonable ground to apprehend... a design to ... do some great personal injury, and there shall be imminent danger of such design being accomplished." Miss. Code Ann. § 97-3-15(f).
The uncontradicted testimony in this case is that when Dedeaux shot Turner, he had every reason to believe and did believe he was in great personal danger at the hands of Turner. I have great difficulty envisioning any reasonable person situated that night as Dedeaux would have acted much differently.
Kimberly Ambrose (Kim) Turner and Luke Turner, who had three children, separated, following which she filed for a divorce. Some five months following the separation, she met Dedeaux and moved into Dedeaux's residence in Pass Christian. Turner upon one or two occasions visited his sons in Dedeaux's and Kim's Pass Christian residence without incident. Dedeaux testified he would either leave or go into his own room when Turner visited.
Following this Dedeaux and Kim moved to Delisle. Thereafter Turner's behavior changed. About a month prior to the slaying, Turner met Dedeaux at a store, put a gun to his throat and told him "to stay away from his kids." At some subsequent time Turner came by their trailer with his girl friend to visit the children. Dedeaux left the room, but upon overhearing Turner threaten to beat Kim up, asked him to leave. Turner returned shortly thereafter armed with a pistol, and asked Dedeaux to come outside, which invitation was declined.
Following this Dedeaux heard reports that Turner "wanted to kill me."
On the night of December 2, 1988, Dedeaux and Kim went to "Isabell's" Lounge where Carolyn D. Lee, Dedeaux's mother, was a waitress. They were having a peaceful, uneventful evening until Turner arrived on the scene, intoxicated. The uncontradicted testimony is that Turner chased Dedeaux from outside into the lounge, following him and chasing him around tables and chairs. Mrs. Lee, in an effort to get her son out and safely home, got Dedeaux and Kim in tow and was accompanying them outside to the car. Turner also came back outside and Mrs. Lee got a pistol out of the trunk of her car. Turner kept following, threatening, and she shot either into the ground or the air to get him to stop. When he did not stop, but kept coming, Dedeaux took the pistol from his mother and shot Turner three times in quick succession. He testified he thought Turner was armed and was afraid he was going to kill him.
All of the above is uncontradicted. Dedeaux had never been convicted of any offense, and never been in any kind of trouble with the law prior to this.

FACTS
Here are the "facts," in detail, which while fairly stated, are presumably related favorably to support its case, verbatim from the State's brief:
The night of December 2, 1988, Toni Brown [hereinafter "Toni"] went to Isabelle's Lounge where she saw her brother, Luke Turner [hereinafter "Luke"], standing on the porch "talking in a very calm tone" to his estranged wife, Kim Turner [hereinafter "Kim"]. Thereafter, Kim's live-in boyfriend, Willie Dedeaux,
came up and grabbed Kim and told Kim to come back inside and Kim told him to just let her talk to Luke a few more minutes and then she would come in and then Willie told Luke that he would whip *35 his mother-fucking ass and Luke said, well, come on with it, and Willie took off running.
Toni, Luke and Kim followed Willie into the club, where "Luke was chasing Willie." In Toni's words,
Willie went  he went into the bar, he came around like this and came back out. And his mother came out right behind him, Luke came out, I came out. His mother had  his mother had like got in front of Luke to try to stop him from running behind him.
... .
And Luke pushed her. And after Luke had pushed her she went to her car and that's when she opened up the trunk of her car and got the gun out.
... .
There was a car to the left of her car and ... Luke and I had just came [sic] around when she had pulled the gun out and said stop and when Luke wouldn't, Luke kept going and then she fired at his feet into the ground.
Willie's mother then handed him the gun. As Luke "turned to come down between the cars, ... Willie started firing." At this point, Willie and Luke were "[a]bout a car length and a half from each other." Toni thought she heard two shots going off "one behind the other." Afterward, she saw Luke "fall to the ground." During the entire altercation, Toni "saw no weapon other than the gun that Mrs. Lee" had retrieved from the trunk of her car. After Luke had fallen, Willie "ran to Kim and grabbed her and told her come on, bring your ass on, let's get away from here."
Rodney Ausmer was another patron of Isabelle's the night of December 2. He saw "Luke running Will around the tables ..." Shortly afterward, "Will went out the place. That's when he went and told his mama something." Luke remained outside. Upon leaving the bar, Ausmer saw Luke "chasing Will around the car" and Mrs. Lee shooting "the gun down at the ground." Dedeaux then "started coming over toward where his mama was at [sic] and he got the gun from her" and "shot the gun three times" at Luke, who was 10 or 11 feet away at the time. Luke then fell to the ground.
The first witness called by the defense, Kim testified that at the time of the shooting, she and Luke had been separated for "[a]bout a year" and that she had filed for divorce. She and Willie were "on the dance floor dancing" when Luke walked into Isabelle's. As the couple walked toward their table, Luke asked Kim to go outside. When she complied, he asked about their three children, who were living with Kim and Willie. She replied that the boys were "okay." Luke then "grabbed" her "by the arm" and told her "to come off the porch with him"; when she refused, he "grabbed" her more "forcefully" and refused to allow her to go back inside. Willie then walked onto the porch, "reached his hand out and said, come on, baby, let's go back inside." Luke, who had been drinking and who was still holding Kim's arm, replied, "[S]he's not going ... anywhere with you, ... punk mother-fucker, I've been promising you this and I'm going to give it to you." At that point, Luke "reached in his back pocket," but Kim did not see him "bring anything out." Upon hearing this threat, Willie said nothing to Luke but "turned around to go back inside."
Having unsuccessfully tried to prevent Luke from following Willie into the bar, Kim "stayed outside." Shortly afterward Willie returned and informed her that his mother had advised them to go home. Kim walked behind him "trying to go get in the car" so that they could leave. Again, Luke began chasing Willie. Mrs. Lee appeared, "went to her car and got a pistol out," and, according to Kim, "shot in the air." Having continued to chase Willie, Luke "stopped for a minute" after he heard the shot. He then resumed chasing Willie, who "grabbed the gun from his mother" and "shot him."
On cross-examination, Kim admitted that Luke was well aware that she had been living with Willie for five months; that he was not surprised to see them together at Isabelle's; that he had said nothing to Willie inside the bar; and that *36 when she and Luke first walked onto the porch, Luke had simply asked about their children. She testified further that when Willie fired the first shot at Luke, Luke was "walking" toward Willie. Luke fell when the second bullet hit him. Kim saw nothing in Luke's hand at the time.
Diane Belton testified that Luke approached her table that night, helped himself to a glass of beer from a pitcher, pointed to Willie on the dance floor and said, "[O]h, m-f'er, I'm going to kill you, punk." As he walked away, Belton saw a bulge in Luke's back pocket.
Ricky Lizana testified that after leaving work at 4:00 the afternoon of December 2, he and Luke drank a fifth of Mad Dog wine, a fifth of gin, a fifth of Thunderbird wine, "a fifth of Seagram's 7 and ... a fifth of Taco [sic] vodka."
Willie's mother, Carolyn Dedeaux Lee, testified she had seen her son "being chased" and that when she "asked him what was going on, he said that "Turner was messing with him ..." She told her son to go home. According to Mrs. Lee,
he started out the door and the guy went out the door behind him. And then I was still waiting on tables and he came back inside. I said I told you to go home and he said, "I'm trying to go home but he won't let me. And I said, well, will walk behind you. So I set the tray on a table and I said I will walk behind you to make sure you get to your car and go home. So he went on ahead and Kim went ahead of me and I was coming behind and this guy, he pushed me.
... .
And then the guy [Luke] took and pushed me and started out behind Willie and, I don't know, somebody in the crowd said Look out. And all I could see was them running around the parking lot.
... .
Willie said, man, all I  I'm don't want no trouble, all I want to do is go home, just leave me alone. And the man kept coming and so Willie shot. I don't know if it was bang, bang, bang; something like that. And I done [sic] back out of the way because the man was bigger than I am and I backed out the way and I said papa, go home.
On cross-examination, Mrs. Lee was impeached with the tape recording of her statement to the police. Afterward, she admitted that she had told the officers that prior to the shooting, Willie had asked her for the keys to her car, explaining that he "need[ed] something" because he was tired of Luke's "picking on" him. She also testified that Willie "took the pistol away from" her, and that Luke "never did touch him."
Willie testified that about a month before the shooting, Luke had grabbed him out of Kim's car, put a gun to his throat, and told him he "could have his wife but stay away from his kids." Additionally, Willie had heard "rumors" that Luke "wanted to kill" him.
Denying that he had threatened to "whip" Luke's "mother-fucking ass" on the evening in question, Willie testified that Luke had threatened him on the porch and that he "reached back and he had something in his hand." Luke then chased him inside the bar. When Willie tried to get into his car to go home, Luke "was just about to the front of the car ..." Informing him that he did not want trouble, Willie asked Luke to leave him alone; but Luke continued to threaten him and to chase him around the cars in the parking lot. Willie thought, "[T]his man if he caught me he was going to kill me." When he heard a shot, Willie turned around and saw his mother with a gun. He then "ran up to her from behind, snatched the gun and kind of pushed her over in between the cars." According to Willie, "And then I just shot." Luke "kept coming" toward him until he was felled by the last shot.
Willie testified that he did not want to leave "the scene of a crime" but that his mother persuaded him to do so. He denied having tried to hide from the law enforcement officers.
Appellee's Brief, pp. 4-9 (brackets original; parentheses original; emphasis added).
*37 Richard Lizano testified that he had been with Turner from 4:00 p.m. on December 2, and the two of them had consumed an enormous amount of alcohol. Although disputed by every other witness, Turner's sister, Toni Brown, testified Dedeaux made the first threat. The record also shows that a search of Turner following the shooting revealed no weapons.
At trial some of the witnesses testified that following the shot made by Carolyn D. Lee, they heard three shots in quick succession (bang, bang, bang). Dedeaux could not recall how many times he fired the pistol. He testified that he shot Turner because he was afraid he was going to kill him.
While the trial testimony of Dedeaux's mother, Carolyn Dedeaux Lee, supported his claim of self-defense, her statement to the police on the night of the shooting said that Dedeaux had asked her for the keys to her car trunk, and when she asked him why he wanted them, he told her he was tired of Turner picking on him.
Dedeaux was indicted August 30, 1989, and tried July 18-19, 1990. At the conclusion of his trial, the State sought a manslaughter instruction on the ground that under the proof in this case such an instruction was authorized, but following a strenuous and protracted objection by the defense counsel the instruction was refused.

SUFFICIENCY OF THE EVIDENCE
Except for the statement Toni Brown testified she heard Dedeaux make at the very beginning of the trouble that evening that he (Dedeaux) was going to whip him (Turner), the uncontradicted evidence shows that Turner was the aggressor, and continued the aggressor throughout the difficulty until he was shot.[1] The record is also uncontradicted that Turner while armed with a pistol had made previous threats against the life of Dedeaux.
Because Dedeaux was authorized under the law to act upon reasonable appearances as well as actual danger, the fact that Turner was unarmed does not deprive him of his claim of necessary self-defense. Bond v. State, 249 Miss. 352, 162 So.2d 510, 512 (1964); Lee v. State, 232 Miss. 717, 723, 100 So.2d 358, 361 (1958). Did Dedeaux have good reason to be afraid for his life that night? Unless we ignore uncontradicted testimony, he certainly did.
The majority ignores the rule of law that it is not incumbent upon an accused to prove that he acted in necessary self-defense, but to the contrary the burden is upon the State to prove beyond a reasonable doubt that at the time of the slaying he did not act in necessary self-defense, and if there is a reasonable doubt thereasto, the accused is entitled to an acquittal.
In Scott v. State, 203 Miss. 349, 34 So.2d 718, 719 (1948), we held:
It was not required of appellant to prove that he acted in justifiable self-defense, but only that he raise a reasonable doubt of his guilt of the charge against him, unjustifiable homicide.
In Sloan v. State, 368 So.2d 228, 229 (Miss. 1979), we held:
The burden of proof in a criminal case never shifts from the State to the defendant. The State is required to prove every material element of the indictment beyond reasonable doubt. Likewise, the defendant is not required to prove that he acted in self-defense, and, if a reasonable doubt of his guilt arises from the evidence, including the evidence of self-defense, he must be acquitted.
Accord Heidel v. State, 587 So.2d 835, 843 (Miss. 1991).
The dubious testimony of Brown that Dedeaux made the initial threat does not deprive Dedeaux of a claim of self-defense, because the undisputed testimony of all witnesses is that following this initial statement, Dedeaux was in continuous retreat from Turner. Nor, as above stated, does the fact that *38 Turner was in fact unarmed deprive Dedeaux of such claim.
Carolyn D. Lee's statement to the police on the night of the slaying, offered into evidence on cross-examination, suggests that Dedeaux was fed up with Turner. According to this statement, during the affray, Dedeaux asked her for the keys to her trunk, and when she asked why, he said, "I'm tired of this guy picking on me, way he picks at me so."
Unfortunately for the State, Lee's unsworn pretrial statement cannot be considered as substantive evidence. This was the law prior to our adoption of the Mississippi Rules of Evidence. Hall v. State, 250 Miss. 253, 264, 165 So.2d 345, 350 (1964): "[E]vidence of extra judicial statements made by a witness who is not a party ... is admissible only to impeach of discredit the witness and is not competent as substantive evidence of the facts to which such statements relate... ." Wilkins v. State, 603 So.2d 309, 317 (Miss. 1992); Moffett v. State, 456 So.2d 714, 719 (Miss. 1984). The Mississippi Rules of Evidence make no change in this evidentiary rule as to out of court unsworn statements. Miss.R.Evid. 613; Jordan v. State, 513 So.2d 574, 581 (Miss. 1987). See also, U.S. v. Martin, 694 F.2d 885 (1st Cir.1982); Whitehurst v. Wright, 592 F.2d 834 (5th Cir.1979); U.S. v. Palacios, 556 F.2d 1359 (5th Cir.1977).[2]
If you gave Mrs. Lee's testimony at trial no weight whatever, tore it out of this record, the uncontradicted evidence of lawful self-defense remains.
Mrs. Lee as a witness testified that her son had not asked for her keys, and when confronted with the pretrial statement, said she was nervous and upset on the night of the shooting and did not recall what she had told the police. The pretrial statement, while at the most bearing upon the credibility of Mrs. Lee's trial testimony, cannot be considered as substantive evidence in opposition to the testimony of other witnesses. Dedeaux positively denied asking his mother for the car keys, or that he unlocked Mrs. Lee's car trunk.
The majority seizes upon discrepancies understandable under the circumstances between Mrs. Lee's testimony at trial and the detailed statement she related to the police the night of the slaying. These discrepancies in no way negate a claim of self-defense: neither the pretrial statement nor the trial testimony suggest anything other than a valid claim of self-defense.
But, as above stated, even if her pretrial statement diminished in some way Dedeaux's claim of self-defense, it cannot under our rules of evidence constitute substantive evidence of guilt. It can only go to Mrs. Lee's credibility as a witness. The majority tells us, "The jury obviously did ignore her prior statement." Majority Opinion, p. 31. The majority is quite correct. The jury obviously did consider this statement, but under the law this Court cannot consider it as substantive evidence of guilt, which is precisely what the majority does to reach its conclusion. The majority sprinkles "facts" from the unsworn pretrial statement as substantive, positive evidence of Dedeaux's guilt; e.g. "Dedeaux unlocked the trunk to his mother's car according to her statement," and "[A]ccording to Carolyn's statement, Dedeaux actually had his hands on the gun prior to her getting it away from him and firing the first shot." Majority Opinion, p. 33.[3]
*39 All the substantive evidence in this record reveals the following:
1. Turner had made prior threats to Dedeaux to kill him, and on one occasion was armed with a pistol when he made the threat;
2. On the night of the slaying, Turner was the aggressor, chasing Dedeaux around tables inside the building, and then following Dedeaux when he left to go outside and leave;
3. Carolyn D. Lee got her pistol and shot it (either into the air or into the ground) in an effort to get Turner to stop. Turner did not stop his pursuit of Dedeaux, and Dedeaux got the pistol from his mother, and verbally warned Turner to stop.
4. Turner did not stop but continued towards Dedeaux, and he shot him. He testified that when he did so he was scared Turner was about to kill him.
As already noted, the threat Brown alleged Dedeaux initially made which dissipated instantly, and the fact that Turner was in fact unarmed does not deprive Dedeaux of his claim of self-defense. Nor does Lee's pretrial statement to the police constitute substantive evidence, for the reasons stated. I have at considerable pain set forth the facts from this record. I have not only set forth the facts precisely as related in the State's brief, which presumably would be as favorable to the State as possible, but have set forth every factual basis upon which a homicide could be predicated. There is nothing in this record to show that Dedeaux did not believe, and did not have reasonable ground to apprehend Turner was about to put his threats against his life into effect, as he testified. Any other hypothesis is conjecture.

MANSLAUGHTER INSTRUCTION
The majority's dissertation on the State's being entitled to a manslaughter instruction is irrelevant.[4]
The majority cites Wells v. State, 305 So.2d 333, 339-40 (Miss. 1974) and Clemons v. State, 473 So.2d 943 (Miss. 1985), in support of its "conviction" of Dedeaux on this appeal of manslaughter. My view is that the holding in these cases should be carefully re-examined, if these cases were properly before us. The dissent in Wells (Rodgers, J., dissenting, 305 So.2d at 340-43), makes more sense to me.
Wells and Clemons, however, in which there was abundant testimony to support a conviction of manslaughter, are a far cry from the facts here.
Before we place the final seal on a man's fate to wear stripes and lace a convict's shoes at Parchman, this Court is entrusted to adhere to settled principles of law.
I would reverse and discharge, and therefore respectfully dissent.
DAN M. LEE, P.J., and SULLIVAN, J., join this opinion.
BANKS, Justice, concurring in part, dissenting in part:
We all agree that the charge of murder is not sustainable. In my view, the charge of manslaughter is sustainable but the evidence is such that a new trial is warranted, as opposed to remand with directions to enter a judgment for manslaughter.
I agree with Justice Hawkins that Carolyn Dedeaux Lee's prior statement cannot be considered as substantive evidence as the majority opinion seems to do. I do not agree that we can reject testimony favorable to the state, out-of-hand, based on our view that it lacks credibility as Justice Hawkins seems to do. When the substantive evidence is viewed, I believe that we can say with confidence that the evidence was insufficient to sustain a verdict of murder warranting a judgment not withstanding the verdict as to that charge and that the jury verdict was so *40 contrary to the weight of the evidence as to evince bias and passion warranting a new trial as to manslaughter in the interest of justice. See Rule 5.16(1) and (2), Uniform Criminal Rules of Circuit Court Practice; Jesco v. Whitehead, 451 So.2d 706, 714 (Miss. 1984) (Robertson, J. Concurring).
Like the majority in Kirkland v. State, 573 So.2d 681 (Miss. 1990), I am "not willing to say that no reasonable juror could have convicted the defendant of manslaughter under these facts, [but] the evidence is, in [my] opinion, exceedingly unconvincing that the shooting was not justified. * * * Under these facts, [I] feel compelled to reverse and remand for a new trial before another jury." 573 So.2d at 683.
NOTES
[1] Brown's testimony as to Dedeaux's threat to her brother stretches credulity when the record shows every other witness denied any such statement, and that Turner was a half-foot taller and outweighed Dedeaux fifty pounds. Both were young men. The record also shows that even if made, it was not much of a threat, because Brown herself testified that after he said it, Dedeaux took off running from Turner.
[2] Both Miss.R.Evid. 801 and Fed.R.Evid. 801, from which our M.R.E. 801 comes, do make significant changes in the evidentiary effect of an inconsistent pretrial statement "given under oath subject to the penalty of perjury at a trial." Such inconsistent statement by definition under this rule is not hearsay and is admissible as substantive evidence. See Miss.R.Evid. 801(d)(1) and comment thereunder. U.S. v. Stockton, 788 F.2d 210 (4th Cir.1986), cert. denied, 479 U.S. 840, 107 S.Ct. 147, 93 L.Ed.2d 89; U.S. v. Plum, 558 F.2d 568 (10th Cir.1977).
[3] The majority's bias is evident in other ways. It tells us Dedeaux "claimed" Turner had something in his hand when he threatened him. Majority Opinion, p. 32. It tells us Collins, the police officer, "was unable to obtain any information concerning any prior threats by Turner against Dedeaux." So what? Is the majority telling us they were not made, that it can disregard Dedeaux's uncontradicted testimony? It takes umbrage at Mrs. Lee telling her son after the slaying to leave and go home. Majority Opinion, p. 32. What on earth was wrong with that? She remained, freely told the officers what had happened and where her son was.
[4] Defense counsel at trial prudently objected to a manslaughter instruction offered by the State, no doubt reasoning that the chances of the jury convicting his client of murder under the facts of this case were quite remote, but a conviction of manslaughter was less improbable. That, however, is neither here nor there, because this was not a case of manslaughter, either.