# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2025-KA-00444-SCT

*STEPHANIE MICHELLE VANCE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/2025 |
| TRIAL JUDGE: | HON. MARK SHELDON DUNCAN |
| TRIAL COURT ATTORNEYS: | TODD WARREN SOREY |
| | WALTON WADE WHITE |
| | JACOB DANIEL HAMM |
| | BRITTANY WHITE BROWN |
| | CHRISTOPHER MORGAN POSEY |
| | P. SHAWN HARRIS |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | JOSEPH SCOTT HEMLEBEN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/05/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**SULLIVAN, JUSTICE, FOR THE COURT:**

¶1.     Stephanie Vance was convicted of first-degree murder following a jury trial in the Neshoba County Circuit Court.  Vance appeals claiming (1) the trial court erred by allowing a culpable-negligence-manslaughter instruction and not issuing an involuntary-manslaughter instruction; (2) lay-opinion testimony offered by the defense was improperly excluded; (3)

the evidence did not support a first-degree-murder conviction, and the verdict was against the overwhelming weight of the evidence; and (4) defense counsel was ineffective for failing to introduce video-surveillance evidence.

¶2. Finding no reversible error, Vance's conviction for first-degree murder is affirmed.

**FACTS**

¶3. Around 9:30 a.m. on March 3, 2023, Neshoba County Sheriff's deputies and investigators were dispatched to a residence in Philadelphia, Mississippi, after Christopher Bland called 911 saying, "She just shot me. She just shot me." The call suddenly ended as Bland was attempting to say the address. The dispatcher called back approximately four and a half minutes later, and Vance answered the phone. She was crying and said her husband had been shot.

¶4. When officers arrived, Vance was standing at the front door holding Bland's and her eight-month-old son. Bland was in the living room lying face up, alive but unresponsive. Bland had been shot once in the chest. There was a visible wound to the left side of Bland's chest and an exit wound near the center of his back. Bland had a holstered gun tucked into his waistband at the small of his back. A bullet was lodged in the wall directly behind Bland. A shell casing was found across the room from Bland. Emergency personnel transported Bland to the hospital. Bland died from the gunshot wound.

¶5. Investigator Josh Burt recovered a 9 mm semi-automatic handgun that was lying on the bed in the master bedroom. A holster for the handgun was located at the foot of the bed. A gunshot-residue test was performed on Vance, and gunshot residue was present on the

2

back and palms of both of Vance's hands.

¶6.    Burt interviewed Vance about the shooting.  Vance told Burt that her gun was holstered and that she had been in the process of taking the gun to her car outside.  Vance said she and Bland were arguing and that when she got to the front door, Bland attempted to reach for the gun, and the gun discharged.

¶7.    Burt testified that Vance's gun holster showed no damage and it was his opinion that because the holster covered the trigger and fit snugly, it was "near about impossible for that weapon to fire without somebody actually removing it to expose the trigger mechanism."

¶8.    Dr. Paul Uribe conducted Bland's autopsy.  He testified that Bland died from a gunshot wound to the chest.  He said that due to the lack of soot and stippling, nothing indicated that Bland had been shot at close range.

¶9.    Vance testified that she and Bland first began their relationship when she was sixteen and Bland was twenty-six.  Both her family and Bland's family did not like the age difference and did not want them to see each other, but they continued to do so in secret for a couple of months.  Vance thereafter married Josh Nichols with whom she had three children.  Nichols was convicted and imprisoned for child abuse against one of their children.  Shortly after Nichols went to prison, Vance and Bland began seeing each other again.

¶10.   Vance said their new relationship was great in the beginning.  But after they learned she was pregnant with Bland's child, Bland began verbally abusing her and became controlling of her.  She said Bland would control where she went and whom she talked to on her phone, often snatching the phone from her.  She said that after their son was born, Bland

3

began physically abusing her. She said that initially, Bland would just grab her arm, though not tightly. "And then it got rougher and rougher, to where he would squeeze and just leave marks on my arms, leave bruises."

¶11. Vance said that one night, she wanted to have a drink after finding out that her mother had stage-four cancer. Bland did not like that she was drinking that night, so he grabbed her and threw her out of the residence into the rain and locked the door. She said, other times, Bland "would throw me down on the ground, choke me, hold the gun to my head, [and] call me names in the process."

¶12. Vance said at one point, she left Bland and went to a women's shelter for almost three weeks because she was tired of Bland beating her and calling her names. She said that she came back home to Bland because she had started a new job and did not have day care for their son at the time. Vance said she told Bland that the abuse had to stop.

¶13. Vance said everything was fine between them for about a week. Then, they went on vacation in Florida. On the way back from Florida, Bland began acting irritated. Vance asked him to stop at a store so she could use the restroom. Bland said, "No. We're not going to stop anywhere." Vance said Bland "was just irritated, so I just shut up and rode."

¶14. Vance said they arrived home from Florida the day before the shooting. As soon as they arrived home, Bland went straight to work. Vance and the couple's son went inside and watched TV. Later, Vance cooked supper, and she put a plate of food for Bland in the microwave. Vance and their son then went to bed. Vance said that Bland did not come home from work at the normal time, which usually was around 10:30 p.m. Vance texted

4

Bland and asked if he was coming home; Bland did not respond.

¶15. Vance said Bland did not come home until around 3 a.m. When he arrived home, Vance asked Bland if he was going to come to bed, and Bland said, "No. I'm going to lay on the couch." Vance went back to bed and lay down for a minute. She then got up and asked Bland if he would come lie down with her. Bland asked her, "Why? And that's when he got irritated." Vance did not know why Bland was irritated.

¶16. Vance went back to bed, and she woke up around 8:30 a.m. According to Vance, Bland had gone into the bathroom, and he came out because Vance had gotten up. Vance noticed that she "had a missed a call from the domestic violence shelter because I had called the domestic violence shelter the night before because I knew I was going back." Vance said, "So I checked on my son. He was asleep in his bassinet, and I grabbed my phone, my keys and my gun. And I started walking to the front door."

¶17. Vance said that she did not go anywhere without her gun. She had bought the gun with her husband a couple of years before. She did not handle it much and had never fired it. Vance told the jury that when she grabbed her gun to leave, it was not in the holster, which was in the bedroom on the bedside table.

¶18. According to Vance, "So I was walking towards the front door, and we had black out curtains, so it was kind of hard to see in our home with all the doors shut and lights off. Well, [Bland] had reached back like that like he's fixing to reach towards his gun, and then he reaches over and grabs me. Like I don't know if he's fixing to try to reach for the gun or just grab my arm to where he can maybe try to grab the gun or I don't know what his plan

5

was, but he grabbed me. And then I had my gun and keys in the same hand, and that's when the gun went off." Vance admitted that she had her finger on the trigger when Bland grabbed her, but she had no intention of shooting him.

¶19. After the gun fired, Bland hit the floor, and Vance immediately took her gun to the bedroom and laid it on the bed. When she came back into the living room, Bland was on the phone with 911. Vance tried to get the phone from Bland's hands. Vance said she had "to pry his fingers from the phone because he's holding on so tightly. That's when the phone got hung up, and so I'm trying to get the phone. I'm shaking so bad. I'm trying to call back - - I didn't know how his phone worked, but, any way, I was trying to get the key pad up to dial 911. And that's when 911 called me back, and I answered."

¶20. Vance denied telling Investigator Burt that the gun was in the holster when Bland was shot. Vance acknowledged that Burt found both the gun and the holster lying on the bed in separate places. Vance said she "could have put both them - - I know I put the gun on the bed, but I'm guessing I grabbed the holster, too, but not when I was getting ready to leave."

¶21. On cross-examination, Vance said she took the gun out of the holster the night before the shooting when she "took it out of [her] vehicle." When asked if the gun was holstered in her vehicle, Vance said that it was not in the holster and that she had the gun beside the holster in the vehicle. When asked why she had a holster, Vance said, "I don't know. I hardly ever used the thing. . . . Because in my vehicle, I just stick my gun down in the thing. My holster could be laying on the seat beside me."

¶22. Later during cross-examination, Vance was asked about the photograph of her

6

bedroom that showed her gun at the head of the bed and the holster near the foot of the bed.

> Q. Is that the bedroom where you slept the night before?
>
> A. Yes.
>
> Q. So the night before is what you testified you got the gun holster out of the car?
>
> A. Correct.
>
> Q. And you put it where - - on the bed and slept with it all night?
>
> A. Yes.
>
> Q. Okay. Well, did you sleep with your gun, too?
>
> A. Yes.
>
> Q. But it's the gun you don't like?
>
> A. Correct.
>
> Q. And so your testimony is it was never holstered whatsoever?
>
> A. Correct.
>
> Q. But you have it; you just don't use it; you just carry it together?
>
> A. Correct.

¶23. The jury found Vance guilty of first-degree murder. Vance appeals her conviction.

## DISCUSSION

### I. Culpable-Negligence Manslaughter

¶24. Vance argues that the trial court erroneously granted the State the option of culpable-negligence manslaughter through jury instructions S-9 and S-10. Vance contends that while a factual basis existed for an involuntary-manslaughter instruction in general, no factual basis

7

existed for a culpable-negligence-manslaughter instruction alone. Vance submits that since no evidence of culpable negligence on her part was presented, the only real option for the jury was acquittal or first-degree murder. Thus, she was prejudiced by jury instructions S-9 and S-10.

¶25. The State argues that Vance is barred from raising this issue on appeal because Vance did not object to either instruction S-9 or S-10 at trial. The State further contends that, procedural bar notwithstanding, the issue is without merit. The State submits that an evidentiary basis showed that Vance either (1) fired the gun accidentally, (2) intentionally shot Bland, or (3) acted negligently by causing the unholstered gun to discharge and kill Bland. Accordingly, neither instruction S-9 or S-10, defining the offense of culpable-negligence manslaughter, was improper.

¶26. The State is correct that Vance did not object to the trial court's granting instructions S-9 or S-10. Failure to object to a jury instruction at trial and acquiescing to the submission of a jury instruction bars the issue from being raised on appeal. ***Butler v. State***, 544 So. 2d 816, 818 (Miss. 1989).

¶27. Procedural bar notwithstanding, we find no merit to this issue. Vance's defense at trial was that this was an accidental shooting resulting from Bland's grabbing Vance's arm as she walking out. The State's theory of the case was that Vance intentionally shot Bland. The jury was instructed on deliberate-design murder, culpable-negligence manslaughter, and excusable homicide.

¶28. Vance testified that she was carrying her gun from the bedroom to her car before the

shooting occurred. The gun was unholstered, loaded, and Vance admittedly had her finger on the trigger. Vance indicated that she may have pointed the gun at Bland, but she maintained that she did not do so intentionally.

¶29. From this evidence, the jury could conclude that the shooting occurred by accident or misfortune while Vance was doing a "lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent[.]" Miss. Code Ann. § 97-3-17(a) (Rev. 2020). The jury could also conclude that by carrying a loaded weapon with her finger on the trigger in the manner she claimed, Vance acted in "a degree so great as to be equal to a complete disregard or indifference to the safety of human life." *See Parks v. State*, 267 So. 2d 302, 304-05 (Miss. 1972) (approving a similar jury instruction for culpable-negligence manslaughter).

¶30. Alternatively, Vance contends that trial counsel was constitutionally ineffective for not objecting to jury instructions S-9 and S-10 and for not requesting a manslaughter instruction other than culpable-negligence manslaughter. To prove an ineffective-assistance-of-counsel claim, a defendant must demonstrate both prongs of the *Strickland v. Washington* test: "that the legal representation was deficient and that the deficient performance prejudiced the defense." *Cox v. State*, 793 So. 2d 591, 600 (Miss. 2001) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

¶31. Because evidence supported culpable-negligence manslaughter, defense counsel's performance not objecting to instructions S-9 and S-10 was not deficient.

¶32. Defense counsel's decision not to request some other manslaughter instruction was

trial strategy in this case. Traditionally, "[w]hether to request a certain instruction generally is a matter of trial strategy." *Greenleaf v. State*, 267 So. 3d 749, 752 (Miss. 2019) (alteration in original) (internal quotation marks omitted) (quoting *McCoy v. State*, 147 So. 3d 333, 347 (Miss. 2014)). "Such choices are presumed strategic unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness." *Id.* (internal quotation marks omitted) (quoting *Rogers v. State*, 85 So. 3d 293, 297 (Miss. 2012)).

¶33. That is the case here. Again, Vance's defense at trial was that the gun accidently discharged when Bland grabbed her arm as she was walking out the front door to go to a women's shelter. Vance remained adamant that she did not intend for the gun to fire, saying that the gun "wouldn't have went off; nothing would have happened" if Bland had not grabbed the gun. We find no merit to the claim that trial counsel was constitutionally ineffective for not objecting to jury instructions S-9 and S-10 or for not requesting a manslaughter instruction other than culpable-negligence manslaughter.

## II. Exclusion of Lay-Opinion Testimony

¶34. Vance contends that the trial court erroneously sustained the State's objection to defense counsel's question to Vance's aunt Anna Roberts about her perception as to whether Vance was being "abused at home." The State objected on the ground that the question called for speculation. Vance argues that the testimony sought from Roberts did not involve speculation but rather involved Roberts's lay opinion based on her first-hand perceptions and was proper under Rule 701 of Mississippi Rules of Evidence.

¶35. We review the trial court's decision to allow or exclude evidence under an abuse-of-

10

discretion standard. ***Toler v. State***, 404 So. 3d 100, 106 (Miss. 2024) (citing ***Bland v. State***, 355 So. 3d 212, 215 (Miss. 2022)). The decision will stand unless the reviewing court concludes that the decision was arbitrary and clearly erroneous. ***Id.*** (citing ***Clark v. State***, 315 So. 3d 987, 994 (Miss. 2021)).

¶36. Roberts was the first witness called by the defense to testify on Vance's behalf. Roberts said she typically saw Vance once or twice a week and that Vance occasionally stayed at her house. According to Roberts, on one occasion, Vance "had a black eye, her nose had been bleeding and her bottom lip was swelled up where it had been busted." Roberts indicated that there were other times when she saw injuries on Vance. Roberts also recalled an instance when both Vance and Bland were at her house. Roberts said she wanted to talk to Vance away from Bland, but Bland would not allow it. According to Roberts, Bland lifted Vance up by her head and put his arm around her neck and said, "'No. She's mine,' and swung her to the side; wouldn't let her come in the kitchen where I was at to talk to her."

¶37. Defense counsel then asked Roberts if she had "forme[d] an opinion as to whether [Vance] was being abused at home[,] . . . based on the things [Roberts] saw on [Vance] and the actions that [Roberts] saw in your home." The State objected, claiming the question called for speculation. The trial court sustained the objection, and defense counsel asked Roberts no more questions.

¶38. Rule 701 limits when lay opinions are admissible:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

11

**(a)** rationally based on the witness's perception;

**(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

**(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

MRE 701.

¶39.    Vance argues that the material issue in her case was not whether she was being physically abused just before the shooting.  Rather, the material issue was whether ongoing abuse corroborated Vance's defense that she was leaving in a hurry to go to a women's shelter and that "Bland, being the over-baring [sic] possessive person that he was, abruptly grabbed Vance which caused an accidental discharge."  Vance submits that any evidence supporting that Vance was the victim of physical abuse at the hands of Bland materially supported Vance's accident defense.

¶40.    We find that the trial court properly excluded Roberts's lay-opinion testimony.  This Court has said that "[t]he requirement of personal knowledge as a prerequisite to lay opinion testimony is absolute."  **Wells v. State**, 604 So. 2d 271, 279 (Miss. 1992).  This  prong of the evidentiary rule requires that "the lay witness have *first-hand knowledge or observation*[,]" and this usually applies to "a witness who was actually at the scene of the crime or accident." **Id.** (quoting **Robertson v. State**, 569 So. 2d 691, 694 (Miss. 1990)).

¶41.    As Vance acknowledges on appeal, Roberts was not at the scene of the shooting. Consequently, Roberts was not, and is not, a witness with first-hand knowledge of the events that transpired at the time of the shooting.

12

¶42. Nor did Roberts have first-hand knowledge with regard to the injuries Roberts said she saw on Vance when Vance was at her house. Roberts said that she had observed those injuries on Vance, but she did not witness how they resulted.

¶43. As to the interaction Roberts said she witnessed between Vance and Bland, this was the only instance that Roberts could recall. And all it indicated to Roberts was that Bland was "kind of possessive of [Vance]."

¶44. This issue is without merit.

### III. Sufficiency and Weight of the Evidence

¶45. Vance claims that since there were no eyewitnesses to the homicide and since Vance's version of events was neither materially contradicted nor unreasonable, the trial court should have granted Vance's motion for a directed verdict under *Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933). Vance also claims that even if this Court finds that the evidence was sufficient for the jury to return a first-degree-murder conviction, the weight of the evidence does not support a first-degree-murder conviction.

¶46. In reviewing a challenge to the legal sufficiency of the evidence in a criminal trial, this Court considers whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Body v. State*, 318 So. 3d 1104, 1108 (Miss. 2021) (internal quotation marks omitted) (quoting *Parish v. State*, 176 So. 3d 781, 785 (Miss. 2015)). We view all the evidence in the light most favorable to the prosecution, we accept all the evidence supporting the verdict as true, and we give the prosecution "the benefit of all reasonable inferences flowing from the evidence." *Hogan v. State*, 755 So. 2d 1073,

13

1075 (Miss. 2000) (citing *Rhodes v. State*, 676 So. 2d 275, 281 (Miss. 1996)).

¶47.    In reviewing a challenge to the weight of the evidence, we will not disturb the jury's verdict unless it appears to be "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Willis v. State*, 911 So. 2d 947, 950 (Miss. 2005) (citing *Stewart v. State*, 909 So. 2d 52, 57 (Miss. 2005)).

¶48.    The State contends that Vance did not raise the *Weathersby* rule at trial and, therefore, is procedurally barred from raising it on appeal. *See Jones v. State*, 154 So. 3d 872, 877 (Miss. 2014) ("Because [defendant] did not raise the *Weathersby* rule at trial, the issue is procedurally barred on appeal." (citing *Page v. State*, 64 So. 3d 482, 489 (Miss. 2011))).

¶49.    The State further contends the *Weathersby* rule is inapplicable to Vance's case, procedural bar notwithstanding. The State submits that Vance provided inconsistent accounts of Bland's death, the events leading up to the shooting, and her actions afterwards. Vance's version of events also was contradicted by witness testimony and physical evidence.

¶50.    The State is correct that Vance did not raise the *Weathersby* rule at trial. The State also is correct that the *Weathersby* rule is inapplicable in this case despite any procedural bar.

¶51.    Under the *Weathersby* rule:

> Where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Weathersby*, 147 So. at 482 (citing *Houston v. State*, 117 Miss. 311, 78 So. 182 (1918)).

¶52.    The rule "does not automatically apply when the defendant is the only eyewitness."

14

*Jones*, 154 So. 3d at 878. And it "has no application where the defendant's version is patently unreasonable, or contradicted by the physical facts." *Id.* (internal quotation marks omitted) (quoting *Blanks v. State*, 547 So. 2d 29, 33 (Miss. 1989)). Nor is it an instruction for the jury; rather, it serves as "a guide for the circuit judge in determining whether a defendant is entitled to a directed verdict." *Turner v. State*, 796 So. 2d 998, 1002 (Miss. 2001) (internal quotation mark omitted) (quoting *Mallett v. State*, 606 So. 2d 1092, 1094 (Miss. 1992)). Ultimately, the rule is "nothing more than a statement of the general principle that the hypothetical 'reasonable' juror must have some material evidence, contradictory to defendant's version, upon which a verdict of guilty beyond a reasonable doubt could be found." *Lanier v. State*, 533 So. 2d 473, 490 (Miss. 1988) (quoting *Harveston v. State*, 493 So. 2d 365, 371 (Miss. 1986)).

¶53. Here, the State presented evidence that Vance and Bland were arguing the morning Bland was shot. Vance reportedly told Investigator Burt that she was transporting the gun from the bedroom to the car to secure the weapon in the car and that the gun was in the holster. Bland tried to grab the gun, and it accidentally went off. At trial, Vance testified that she and Bland had not been arguing and that the gun was not in the holster when she was taking it to the car. Vance never called 911 for help after Bland was shot. Instead, Vance took the gun to the bedroom and put it on the bed where its holster, which Vance said she never used, also was located.

¶54. Meanwhile, Bland himself called 911 saying, "She shot me. She shot me." The call abruptly ended as Bland was attempting to say the address. Vance said the phone "hung up"

15

when she returned from the bedroom and tried to remove the phone from Bland's hands. Vance had "to pry his fingers from the phone because he's holding on so tightly." Vance said she was trying to get the key pad up to call 911 back, but she did not know how to work Bland's Android phone. Vance said she too had an Android, but it was a different type. Vance said she had her phone in her hand when she was trying to leave when Bland was shot. Afterwards, Vance threw her phone "in the baby's car seat." Vance indicated that she knew where her phone was when she was trying to use Bland's phone to call 911. Vance eventually spoke to the 911 operator when he called Bland's phone approximately four and a half minutes after the phone hung up. Vance said she was on the phone with the 911 operator until the police arrived. Vance's father testified at trial that Vance had called him after Bland was shot and before the police arrived.

¶55.    The State presented other evidence that contradicted Vance's version of events. Based on Vance's version, the shooting was at close range. A bullet was lodged in the wall directly behind Bland, but a shell casing was found across the room from where Bland's body was located. And the State's expert who conducted Bland's autopsy testified that he saw no evidence of what he would consider a close-range discharge of a firearm.

¶56.    Lastly, Vance testified that she was in a hurry to leave the residence to go to a women's shelter when she accidentally shot Bland. Vance though never really explained why she was in such a hurry to get to the shelter.

¶57.    Vance said that the week before the shooting, she and Bland had vacationed in Florida after Bland had received his tax refund. The only problem they had on the trip according to

Vance was on the way back when Bland became irritated and refused to stop for Vance to use the restroom. When they arrived home, Bland went straight to work. Vance said there was no fight or argument between them before Bland left. Though Bland did not come home from work at his normal time, Vance said fight or argument occurred between them when he finally arrived home around 3 a.m. Vance said she asked Bland to come lie in the bed beside her because she has trouble sleeping when Bland is not there with her. Bland declined and said he was going to stay on the couch. Vance went back to bed. She awoke the next morning when Bland was in the bathroom. She saw that she had a missed call from the women's shelter, which she had called the night before "because I knew I was going back." Vance checked on the baby, who was still asleep. She then grabbed her gun, keys, and phone and proceeded to leave for the women's shelter.

¶58. We agree with the State that Vance's version could be seen as both unreasonable and improbable to the fact finder. The State's evidence and Vance's account created factual issues for the jury. The *Weathersby* rule is inapplicable in this case.

### *Sufficiency of the Evidence*

¶59. The jury was instructed on first-degree murder, which is defined as the "killing of a human being without authority of law by any means or in any manner . . . [w]hen done with deliberate design to the effect the death of the person killed[.]" *See* Miss. Code § 97-3-19 (Rev. 2020).

¶60. This Court has stated that a "deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent[.]" ***Catchings***

17

*v. State*, 684 So. 2d 591, 595 (Miss. 1996). This Court also has said that "[u]nless one expresses his intent, the only method by which intent may be proven is by showing the acts of the person involved at the time, and by showing the circumstances surrounding the incident." ***Thompson v. State***, 258 So. 2d 448, 448 (Miss. 1972). "[I]ntent is a fact question for the jury to decide." ***Jones v. State***, 421 So. 3d 1231, 1234 (Miss. 2025) (quoting ***Thomas v. State***, 277 So. 3d 532, 535 (Miss. 2019)). Further, "deliberate design 'may be inferred through the intentional use of any instrument[,] which based on its manner of use, is calculated to produce death or serious bodily injury.'" ***Watts v. State***, 402 So. 3d 744, 749 (Miss. 2025) (alteration in original) (quoting ***Holliman v. State***, 178 So. 3d 689, 698 (Miss. 2015)).

¶61. Viewing the evidence in the light most favorable to the State, a rational juror could have found beyond a reasonable doubt that Vance intended to shoot Bland. The State's expert testified that no evidence showed that the gun was in close range to Bland when it was fired, contradicting Vance's claim that Bland had grabbed her arm at the time of the shooting and was thus in close proximity to Vance. A rational juror could infer from the entry and exit wound on Bland, where the shell casing was discovered, and the gun residue on both the back and palms of Vance's hands, that the shooting did not occur in the manner Vance claimed. One also could reasonably reject Vance's claim that she always carried her gun and unused holster together and that she had slept the night before with the gun and unused holster in her bed. To the contrary, one could reasonably infer from the evidence that the gun was in the holster before the shooting and that Vance purposely removed the gun from the

18

holster and fired it at Bland.

### *Weight of the Evidence*

¶62.    Alternatively, Vance submits that even if this Court finds that the evidence was sufficient to support a first-degree-murder conviction, the weight of the evidence does not support a first-degree-murder conviction. Instead, Vance claims, the evidence only supports a verdict of acquittal for an accidental homicide or an involuntary-manslaughter conviction.

¶63.    Vance points to *Tait v. State*, 669 So. 2d 85 (Miss. 1996); *Dedeaux v. State*, 630 So. 2d 30 (Miss. 1993); and *Clemons v. State*, 473 So. 2d 943 (Miss. 1985), three cases in which this Court reversed murder convictions and remanded for resentencing for manslaughter. Vance asks this Court to take guidance from these decisions and to reverse Vance's murder conviction and render a manslaughter conviction.

¶64.    These cases are distinguishable from Vance's case. Both *Dedeaux* and *Clemons* involved drunken bar-room brawls that resulted in the intentional shooting death of the victim, *Dedeaux*, 630 So. 2d at 31-32, or intentional stabbing death, *Clemons*, 473 So. 2d at 944. In both *Dedeaux* and *Clemons*, conflicting accounts were given by eyewitnesses as to who was the initial aggressor, and the Court found in both cases that the evidence did not support a conviction for murder but that it did support a conviction for manslaughter. *Dedeaux*, 630 So. 2d at 33 (finding that the killing was clearly "in the heat of passion"); *Clemons*, 473 So. 2d at 945 (same, but only referencing "manslaughter").

¶65.    In *Tait*, the defendant was convicted of depraved-heart murder for the shooting death of his close friend. *Tait*, 669 So. 2d at 87. The two had been playing with a gun, "joking

19

around and horseplaying." *Id.* At one point, the defendant put the gun to his friend's forehead and pulled the trigger, killing him. *Id.* Afterwards, the defendant fell to the ground and started crying. When authorities arrived, the defendant "was holding his head, sobbing, and saying, 'I killed him. Oh, my God, I killed him. I shot him.'" *Id.*

¶66. At trial, the jury was instructed on depraved-heart murder and heat-of-passion manslaughter, and the jury found the defendant guilty of the former. On appeal, this Court found that the evidence did not support either depraved-heart murder or heat-of-passion manslaughter but that it did support culpable-negligence manslaughter. *Id.* at 90. Accordingly, this Court reversed the conviction and rendered a conviction for culpable-negligence manslaughter. *Id.* at 91.

¶67. Here, the evidence does not support heat-of-passion manslaughter. Again, Vance's defense at trial was that the gun accidentally discharged when Bland grabbed her arm. She said she was not angry with Vance, but she was in a hurry to get to the women's shelter and had her finger on the trigger. As already explained, this would support culpable-negligence manslaughter. That offense, though, was presented to the jury and rejected by it, along with Vance's versions of what happened. Instead, the jury concluded from the facts and the evidence that Vance deliberately shot and killed Bland.

¶68. As discussed, the evidence supports the jury's conclusion, and we do not find the guilty verdict to be "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Willis*, 911 So. 2d at 950 (citing *Stewart*, 909 So. 2d at 57).

20

**IV. Ineffective-Assistance-of-Counsel for Failed Attempt to Introduce an In-Home Security-Camera Recording**

¶69. Vance testified at trial that she had a video recording from and Bland's and her in-home security camera that showed an incident of Bland's abusing her. Vance said she sent the video recording to her children's "adoptive parents," who then sent it to Vance's family. In attempting to lay a foundation to authenticate the video recording before introducing it into evidence, the following exchange took place between Vance and defense counsel:

Q. You have watched this video today, have you not?

A. No.

Q. You don't remember watching it on my computer?

A. No.

Q. So you don't know what's on here?

A. No.

¶70. Vance contends that this exchange illustrates that she misunderstood what counsel was referring to with his questions. Vance submits that counsel should have asked to voir dire her outside the presence of the jury to clarify the misunderstanding or refresh her memory.

¶71. The video recording is not a part of the trial record. Thus, the record is insufficient for us to address this particular ineffectiveness claim on direct appeal. Therefore, we dismiss this claim without prejudice, allowing Vance to the raise the claim if she chooses in a properly filed motion for post-conviction relief. In *Sandlin v. State*, 156 So. 3d 813, 819 (Miss. 2013), this Court reiterated:

Because the Court is limited to the trial record on direct appeal, issues of

21

ineffective assistance of counsel are more appropriate in a motion for post-conviction relief. ***Parker v. State***, 30 So. 3d 1222, 1232 (Miss. 2010). However, the Court may address the claims on direct appeal if the issues are based on facts fully apparent from the record. ***Id.*** If the record is not sufficient to address the claims on direct appeal, the Court should dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction relief. ***Id.***

## CONCLUSION

¶72. Finding no reversible error, we affirm Vance's conviction for first-degree murder.

¶73. **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., ISHEE, GRIFFIS AND BRANNING, JJ., CONCUR.**